**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **601 D. Street NW, Rm. 9134** | ) | |
| **Washington, DC 20004** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.  16-cv-1473** |
| | ) | **JURY TRIAL DEMANDED** |
| **DYNCORP INTERNATIONAL, LLC** | ) | |
| **1700 Old Meadow Road** | ) | |
| **McLean, VA 22102** | ) | **False Claims Act** |
| | ) | **31 U.S.C. §§ 3729-3733,** |
| **Defendant** | ) | **Common Law Causes of Action** |
| | ) | |

**THE UNITED STATES' COMPLAINT**

The United States of America, for its complaint, alleges as follows:

1.      This action seeks treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, based on fraud, material false claims for payment, and material false statements made by defendant DynCorp International, LLC ("DynCorp").  DynCorp's misconduct arose from its civilian police ("CIVPOL") contract with the U.S. Department of State ("State Department") to assist in the training and equipping of a new civilian police force in Iraq, and other services needed to support that effort, such as trainers, guards, translators, vehicles and living quarters for DynCorp and State Department employees.

2.      DynCorp chose to subcontract several of its obligations under the CIVPOL contract to Corporate Bank Financial Services, Inc. ("Corporate Bank"), including requirements to provide lodging accommodations and local national (*i.e.,* Iraqi) security guards, drivers, and translators.

3.      The CIVPOL contract initially authorized DynCorp's services for a short period of time, and was extended several times between April 2004 through December 2008 (the "relevant time period").  During this period, DynCorp submitted a series of price proposals for the three Task Orders ("T.O.s") at issue in this matter to the State Department for continued work under the  CIVPOL contract, as set forth in Exhibit A (Price Proposals and Amended Proposals).  Each of these proposals reflected the various rates for Corporate Bank's services, and DynCorp generally used the rates when billing the State Department for Corporate Bank's services.

4.      Before it submitted its price proposals to the State Department, however, DynCorp knew that the rates provided by Corporate Bank or its affiliate, The Sandi Group ("TSG"),[1] for hotel facilities and local national security guards, drivers, interpreters, and managers were unreasonable.  Specifically, DynCorp knew that Corporate Bank's hotel rates were not competitive with the market for similar facilities in Iraq and consisted of undocumented and often illusory costs.  DynCorp also knew that Corporate Bank's labor rates were uncompetitive with the market in Iraq and consisted of unverified, non-existent, or inflated rate components, such as portions of direct salaries that Corporate Bank did not actually pay its employees.  Finally, DynCorp knew that the general-and-administrative ("G&A") rates Corporate Bank added to its hotel and labor rates were excessive and did not reflect or approximate Corporate Bank's actual administrative expenses.

---

[1]      Corporate Bank and The Sandi Group shared executive leadership, including Rubar Sandi, the owner and chairman of both entities.  DynCorp referred to Corporate Bank and TSG interchangeably during the relevant time period.  Unless otherwise noted, this complaint will refer to both companies as "Corporate Bank."

5.      Despite this knowledge, DynCorp chose to protect its relationship with Corporate Bank at the expense of the public fisc by accepting uncompetitive and unsupported rates from Corporate Bank and passing them forward to the State Department in pricing proposals and invoices.  In doing so, DynCorp ignored its contractual obligation to ensure that its subcontractor's prices were reasonable and misrepresented the bases for its proposed pricing.

6.      In its pricing proposals, DynCorp represented that Corporate Bank's rates were based on "historical data" or a "vendor quote" without disclosing the critical, material, qualifying information that would have alerted the State Department that the rates were unreasonable.  The State Department relied upon DynCorp to engage in open and honest negotiations to support its proposed prices.  By misrepresenting and omitting information reflecting the true nature and bases of Corporate Bank's rates, DynCorp skewed price negotiations with the State Department and caused the State Department to agree to higher contract prices than it otherwise would have.  DynCorp's invoices, which reflected these inflated subcontractor rates and DynCorp's own fees and mark-ups, were false and fraudulent claims.

7.      DynCorp understood the ramifications of its failure to ensure fair and reasonable prices from Corporate Bank.  One DynCorp executive observed in an April 2007 email that Corporate Bank had received millions of dollars in "fraudulent billings" at taxpayer expense and that DynCorp was "just letting it happen."  DynCorp ultimately received from the State Department more than $65 million for hotel accommodations provided by Corporate Bank, in addition to over $70 million for guards, drivers, translators, and other Iraqi local national employees provided by Corporate Bank.  These payments also included millions of dollars in overstated Corporate Bank G&A charges.

**JURISDICTION AND VENUE**

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 and 28 U.S.C. § 1345.  This Court may exercise personal jurisdiction over the defendants

pursuant to 31 U.S.C. § 3732(a).

9.      Venue is proper in the District of Columbia under 31 U.S.C. § 3732 and 28

U.S.C. § 1391(b) and (c) because the defendant transacted business in this District and

committed acts proscribed by 31 U.S.C. § 3729 in this District.

**PARTIES**

10.      The United States of America brings this action on behalf of the State

Department, a cabinet-level agency of the United States with its headquarters in Washington,

D.C.  The mission of the State Department is to create a more secure, democratic, and prosperous

world for the benefit of the American people and the international community.

11.      DynCorp is a Delaware corporation with headquarters located at 1700 Old

Meadow Road, McLean, Virginia 22102.  During the relevant time period, DynCorp provided

various services to civilian and military government agencies and commercial customers,

including the State Department.

**THE FALSE CLAIMS ACT**

12.      The False Claims Act ("FCA"), establishes liability for the following:

a.      Any person who knowingly presents, or causes to be presented, to an

officer or employee of the United States government a false or fraudulent claim for payment or

approval, 31 U.S.C. § 3729(a)(1) (through May 19, 2009); and

b.      Any person who knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim, 31 U.S.C. § 3729(a)(1)(B) (formerly 31 U.S.C. 3729 § (a)(2)).[2]

13.      Under the FCA, the term "knowingly" means that a person, with respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b).

14.      No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA.  31 U.S.C. § 3729(b).

15.      The FCA provides for recovery of three times the damages sustained by the United States (treble damages), plus a civil penalty for each false claim.  31 U.S.C. § 3729(a) (through May 19, 2009).

16.      The civil penalty is to be not less than $5,500 and not more than $11,000.  31 U.S.C. § 3729(a), as amended by the Federal Civil Penalties Inflation Adjustment Act of 1990, and the Debt Collection Improvement Act of 1996.  *See* 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999).

**STATUTE OF LIMITATIONS**

17.      Under the False Claims Act, the United States may file a complaint either within six years of the violation or within three years of when material facts about the violation were

---

[2] Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 (FERA), amended the FCA on May 20, 2009.  Section 4(f) of FERA set forth that Section 3729(a)(1)(B) "shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. §§ 3729 et seq.) that are pending on or after that date."  Section 4(f) of FERA applies only to our claims under Section 3729(a)(1)(B).  Section 3279(a)(1) of the FCA, prior to FERA, otherwise applies here.

known or reasonably should have been known to the Department of Justice, so long as it is within ten years of the violation.  31 U.S.C. § 3731(b).  The FCA explicitly states that the applicable period will be "whichever occurs last."  *Id.*

18.     DynCorp executed tolling agreements with the United States that tolled the running of the statute of limitations from January 29, 2011, to and including July 18, 2016.

19.     The Department of Justice neither knew nor reasonably should have known facts giving rise to its FCA and common law claims prior to January 29, 2008, or three years prior to the tolled period.

20.     All of the allegations regarding false claims in this matter are timely under 31 U.S.C. § 3731(b)(1) and common law statutes of limitations.

## THE FEDERAL ACQUISITION REGULATION

21.     The Federal Acquisition Regulation ("FAR") is the principal regulation that governs United States government contracts, including the CIVPOL contract.  *See* 48 C.F.R. Federal procurement contracts also may incorporate by reference the standardized contract provisions found in Part 52 of the FAR.

22.     Subpart 15.4 of the FAR, concerning the pricing of negotiated prime contracts, obligates prime contractors such as DynCorp to "[c]onduct appropriate cost or price analyses to establish the reasonableness of proposed subcontract prices."  FAR 15.404-3(b)(1).  Such cost or price analyses include obtaining certified cost or pricing data or other than cost or pricing data, ensuring that the price was the result of adequate competition, conducting a market price comparison, examining historical price data, or considering the subcontractor's underlying costs to ensure that the overall price is fair and reasonable.  *See* FAR 15.404-1(a)-(c) and 15.402(a).

23.     In addition to the FAR requirements for price reasonableness, the CIVPOL contract incorporated by reference FAR 52.216-7 (Allowable Cost and Payment) (February 2002), which permits reimbursement of costs only to the extent they are allowable under FAR Subpart 31.2.  FAR Subpart 31.2 permits contractors to recover only those costs that were allowable, reasonable, and allocable to the contract.  FAR 31.204(a).  This includes costs incurred for payment or reimbursement to subcontractors.  FAR 31.204(b).

24.     "A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business."  FAR 31.201-3(a).  Whether a cost is reasonable under this standard depends on various considerations, including generally accepted sound business practices, arm's length bargaining, and the contractor's responsibilities to the government and the general public.  FAR 31.201-3(b).  In addition, the reasonableness of costs "must be examined with particular care" in the absence of "effective competitive restraints."  FAR 31.201-3(a).

25.     A contractor's costs are not presumed to be reasonable; instead, the burden of proof is on the contractor to establish that a challenged cost is reasonable.  FAR 31.201-3(a).

26.     FAR 31.201-2 sets forth the principles for determining whether costs are allowable.  FAR 31.201-2(a).  A cost must be reasonable to be allowable.  FAR 31.201-2(a)(1).  Contractors must also maintain records, including supporting documentation, demonstrating that the costs incurred under the contract are allowable.  FAR 31.201-2(d).

27.     The CIVPOL contract incorporated by reference FAR 52.242-3 (Penalties for Unallowable Costs) (May 2001).  This provision states that the contractor "shall not include in any proposal any cost that is unallowable."  FAR 52.242-3(c).

## STATEMENT OF FACTS

### I.  The DASM Contract

28.     The State Department awarded to DynCorp the Department of State Advisory Support Mission ("DASM") contract, No. S-LMAQM-03-C-0028, on April 18, 2003, following a competitive bid process.

29.     Under DASM, the State Department required DynCorp to support the State Department mission in Iraq by identifying, training, and deploying advisors with law enforcement, corrections, and judicial expertise, in addition to providing pertinent support services.

30.     On May 2, 2003, DynCorp subcontracted with Corporate Bank on a sole-source basis to procure hotels and local national labor to fulfill a portion of the State Department's DASM requirements in Iraq.

31.     The DASM contract allowed DynCorp to bill only actual costs plus agreed profit, and required DynCorp to have support for all of its costs, including those attributable to its subcontractor, Corporate Bank.  DynCorp's experiences on DASM made it aware of Corporate Bank's inability to perform basic administrative functions, including accounting for costs and submitting timely and accurate invoices, and other contract performance issues.  DynCorp did not inform the State Department about these subcontractor issues prior to awarding Corporate Bank a sole-source subcontract worth over $200 million on the CIPOL contract, however.

### II.  The CIVPOL Contract

#### A.      The State Department Request for Proposals

32.     In late 2003, the State Department issued Request for Proposals ("RFP") No. S-LMAQM-03-R-0109, for the CIVPOL contract.  The CIVPOL contract was designed to strengthen various foreign criminal justice systems and improve security operations by

employing law enforcement professionals to support international civilian police initiatives. The RFP called for work to be performed in various countries around the world, including Iraq, Afghanistan, Haiti, Jordan, Liberia, and Kosovo.   DynCorp was one of three contractors that responded to the RFP.

33.     The scope of work set forth in the RFP included many of the same tasks DynCorp had performed in Iraq under DASM, such as providing housing for State Department and contractor support personnel, and providing security, transportation, and translation services.

34.     During the competitive bid process for the CIVPOL contract, DynCorp promised the State Department a "low-risk solution" consisting in part of "reliable subcontractor relationships" and "procurement system oversight by corporate headquarters, including audits." DynCorp further boasted of its development of "industry best practices to develop best-price estimates for the required services."

## B.     CIVPOL Iraq Awarded to DynCorp

35.     On February 18, 2004, the State Department, through its contracting component, awarded DynCorp the Iraq portion of the worldwide CIVPOL contract, No. S-LMAQM-04-C-0030.  Two other contractors were awarded portions of the contract dealing with other locales.

36.     The CIVPOL contract was an indefinite delivery, indefinite quantity ("IDIQ") contract, which is a type of contract that requires contractors to provide an indefinite quantity of services for a fixed period of time.  The government may use IDIQ contracts for recurring needs when it cannot determine, above a certain minimum, the quantity of supplies or services required.  As the need for supplies or services is determined, the government can place orders against an IDIQ contract for those requirements up to a pre-determined limit, either measured in

units for supplies or dollars for services.  The government may award IDIQ contracts under a single RFP to one or more contractors.

37.     Unlike other IDIQ contracts, where previously selected  prime contractors subsequently compete against each other for task orders, the State Department awarded DynCorp all of the Iraq Task Orders at issue in this case (Task Orders 0338, 1436, and 2059) on a non-competitive, sole-source basis.  Accordingly, DynCorp's proposals for these specific task orders were not subject to price or technical competition.

### C.     The Corporate Bank Subcontract

38.     Without seeking proposals from other potential subcontractors—yet knowing Corporate Bank's deficiencies as a subcontractor— DynCorp awarded CIVPOL Subcontract 04-001 to Corporate Bank.  On January 18, 2005, Emine Cetinkaya, President of Corporate Bank, and Timothy Crawley, a DynCorp executive, signed Subcontract 04-001 and made it retroactive to February 18, 2004, so that it ostensibly covered Corporate Bank's work from the start of the CIVPOL contract nearly one year prior to the signing date.  Among other tasks described in Subcontract 04-001, Corporate Bank was to provide logistical support to DynCorp in Iraq; act as a liaison between the Iraqi government and commercial agencies; arrange transport facilities; provide for offices, housing, translation services, and access to community leaders; and recruit local personnel, including security guards.  Until Subcontract 04-001 was signed, Corporate Bank was apparently providing CIVPOL services to DynCorp pursuant to Subcontract 03-002, Corporate Bank's cost-plus-fixed-fee DASM subcontract.

39.     DynCorp billed the State Department for Corporate Bank's services under various contract line item numbers ("CLINs") specified in its CIVPOL Task Orders.

40.     DynCorp billed the State Department for hotel accommodations through CLIN 0037, a cost reimbursable CLIN.  Under a cost-reimbursable CLIN, the contractor may be reimbursed its actual costs only to the extent such costs are allowable, reasonable, and allocable to the contract.  FAR 31.204.

41.     For all other services at issue, including security guards, drivers, translators, and the supervisors for these employees, DynCorp billed the State Department under CLIN 0043 from April 17, 2004, through July 31, 2007.   CLIN 0043 was added to the CIVPOL contract as Modification 1.  This modification had an effective date of April 6, 2004, and was signed on April 9, 2004, nearly two months after contract award.  Therefore, the CLIN 0043 prices were not subjected to competition.

42.     CLIN 0043 was an undefinitized firm-fixed-price CLIN.  An undefinitized contract or CLIN is a contract action for which the price or other contract terms are not agreed upon before performance begins.

43.     In July 2007, DynCorp stopped billing Corporate Bank's labor under CLIN 0043 and started billing these costs through cost-reimbursable CLIN 0040.

**D.     DynCorp's Negotiations with the State Department**

44.     Task Order 0338, the first task order issued to DynCorp under the CIVPOL contract, authorized services beginning April 17, 2004, up to a specific dollar amount.  On June 3, 2004, DynCorp submitted its initial price proposal for Task Order 0338 to the State Department covering, among other things, Corporate Bank's hotels, local national labor rates and G&A. During the course of contract performance, the State Department issued two additional task orders to DynCorp (T.O.s 2059 and 1436), and extended DynCorp's services under T.Os. 1436 several times as the need for additional (or modified) services became apparent.  In

response to each task order or extension, DynCorp submitted price proposals and amended proposals for Corporate Bank's services covering 12 different periods of performance, with the majority applying to TO 1436.  *See* Exhibit A (Price Proposals and Amended Proposals).

45.     For example, on January 27, 2006, the State Department informed DynCorp that it wanted to extend performance under TO 1436 for 180 days so that it covered February 12, 2006 to August 11, 2006.  DynCorp submitted a price proposal for the extension period on February 6, 2006, and submitted revised proposals for that same period on March 10, 2006; May 15, 2006; and August 4, 2006.

46.     DynCorp set forth the rates it proposed to bill for Corporate Bank's lodging and labor services in its various proposals to the State Department.  DynCorp also provided a justification for each of the proposed rates, such as "historical data" or "vendor quote." DynCorp thus implicitly represented to the State Department that its proposed rates were reasonable.

47.     The State Department relied on the information in DynCorp's proposals when it negotiating with DynCorp and establishing prices.

48.     DynCorp ultimately billed the State Department for services provided under the CIVPOL contract, including those provided by Corporate Bank, through a series of public vouchers.  Each voucher was identified by a unique number, and listed the task order, the billing period, the date submitted, and the CLIN under which the work was billed.   Exhibit B attached to this Complaint provides a list of the public vouchers which the government alleges contain falsely inflated prices and costs.

### III.   DynCorp's Relationship with Corporate Bank

49.   DynCorp's senior management, including Steve Cannon (President and CEO) and Jay Gorman (Chief Operating Officer), viewed Corporate Bank as a "strategic partner" that would help DynCorp grow its business in Iraq and elsewhere.  As a result, DynCorp prioritized preserving its relationship with Corporate Bank over its responsibility under the CIVPOL contract and the FAR to ensure that the subcontractor costs and prices it charged to the government were reasonable.

50.   More than two years into contract performance, in September 2006, Richard Cashon, DynCorp's Vice President for CIVPOL Operations, summarized the situation with Corporate Bank for DynCorp's Board of Directors.  In a formal presentation, Cashon reported that Corporate Bank's hotels and labor were "expensive" and Corporate Bank consistently refused to provide evidence to justify its rates, including "lease agreements" for the hotels Corporate Bank provided and "documentation on salaries" paid to Corporate Bank's local national employees.  Cashon explained that DynCorp permitted this behavior because it had a special relationship with Corporate Bank.  In particular, Cashon noted that Corporate Bank "[c]ontinually sought and received the 'protection' of Steve Cannon and Jay Gorman when confronted by low and intermediate levels of [DynCorp] management."

51.   DynCorp never disclosed to the State Department that it viewed Corporate Bank's hotel, labor, and G&A rates as excessive.  DynCorp also never disclosed its consistent failure to obtain evidence supporting the rates, such as lease documents for the hotels it charged the State Department or documents on salaries for local nationals.  Instead, DynCorp presented these rates to the State Department as reasonable, justified by "historical data" or a "vendor quote."

**IV.    DynCorp's False Claims and Statements to the State Department**

**A.    Unreasonable Hotel Rates**

52.    DynCorp knowingly failed its obligation as a prime contractor to obtain fair and reasonable lodging prices from Corporate Bank, knowingly made false statements and key omissions in order to give the State Department the mistaken impression that the hotel rates were reasonable, and knowingly submitted false claims worth millions of dollars for these unreasonable rates.  DynCorp's false claims to the State Department for inflated hotel rates spanned the period from April 2004 through June 2007 and are listed in Exhibit B.  The State Department ultimately paid these claims without knowing that they were false.  Had the State Department known the truth, it would not have paid the false claims.

53.    DynCorp provided housing for U.S. government personnel and others during both DASM and CIVPOL.  To meet these obligations, DynCorp subcontracted with Corporate Bank to provide housing at the Baghdad Hotel, the Al-Sadeer Hotel, the Chwar Chra Hotel, the Khanzad Hotel, and other hotels in Iraq.

54.    Prior to signing the CIVPOL contract with the State Department, DynCorp knew that Corporate Bank claimed to lease the required lodging from a related entity, Al-Katin General Trading Co. ("Al-Katin").  Corporate Bank claimed to hold at least a 49 percent ownership stake in Al-Katin and represented that the relationship between the two entities was that of "partners."

55.    Although DynCorp knew that Corporate Bank and Al Katin claimed to be related entities, DynCorp failed to verify the existence and prices of the purported lease agreements, to determine whether the purported lease transactions between Corporate Bank and Al-Katin were "arm's length" transactions, or to require other proof that the lease prices were reasonable.

Instead, in its June 3, 2004, proposal to the State Department, and in subsequent invoices based on that proposal, DynCorp simply passed on to the State Department the rates Corporate Bank claimed for the hotels, without any evidence the amounts were reasonable.

56.     In November 2004, Corporate Bank informed DynCorp that Al-Katin had been "dissolved."  DynCorp continued to charge the State Department the same inflated hotel rates that Corporate Bank proposed when it was supposedly leasing the properties through Al-Katin, and did so without requiring Corporate Bank to justify the reasonableness of its rates.

57.     Throughout its CIVPOL performance, DynCorp acknowledged internally that Corporate Bank's hotels were overpriced and not competitive with market rates in Baghdad.  For example, on February 1, 2005, Spence Wickham, a senior vice president and DynCorp's proposal manager for the original CIVPOL solicitation, discussed obtaining a quote for leasing the Palestine Hotel, a secure facility in Baghdad that DynCorp determined was cheaper than the hotels Corporate Bank offered.  Wickham explained in an internal email that "I am not trying to create a problem with Corporate Bank but Steve [Cannon, DynCorp's President and CEO] has to be brought to the reality of the markup on our current hotels."  Wickham further stated that if the State Department put the next task order up for bid, DynCorp would not be able to "win the CIVPOL Iraq business back if we allow these outrageous rates to continue."

58.     In October 2005, DynCorp's CIVPOL Contract Manager also noted in an email to Corporate Bank that a DynCorp "informal market survey" indicated that the hotel rates were unacceptable.  On March 20, 2006, DynCorp's CIVPOL Iraq Support Manager likewise stated in an internal email that when DynCorp "went out and asked for quotes" it found that hotels "just down the street from the Baghdad Hotel" were significantly cheaper.  In December 2006, a

DynCorp Contract Administrator further observed in an internal email that Corporate Bank's rates were approximately twice as expensive as a standard hotel room in Baghdad.

59.     However, DynCorp never told the State Department what it had long acknowledged internally—that the hotel rates were "outrageous" and uncompetitive with the market in Iraq.   Instead, in a letter dated February 24, 2005, Tim Crawley, DynCorp's Vice President for Contract Administration, told the State Department that DynCorp was unable "to negotiate rates below the current level," because the "market is dictating the rate."  DynCorp then included the same hotel rates that Wickham had called "outrageous" a month earlier in its March 9, 2005 proposal to the State Department and falsely stated that the rates were justified due to "historical data."  DynCorp's false statements and omissions regarding the hotel rates were material.

60.     Not only did DynCorp charge exorbitant and uncompetitive hotel rates, but it also charged the government for every room in Corporate Bank's hotels, including rooms that were unoccupied.  As Richard Cashon, DynCorp Vice President for CIVPOL Operations, remarked in an April 18, 2006, internal email, this meant that DynCorp was "paying a more than fair price for the hotels," because it was "paying full occupancy at a top end rate."  Nonetheless, DynCorp included these excessive rates in its proposals and claims to the State Department, including a proposal submitted to the State Department on May 15, 2006, only one month after Cashon internally acknowledged that the hotel rates were unfairly expensive.

61.     Cashon made a presentation on or about September 14, 2006, to DynCorp's Board of Directors that cited DynCorp's inability to obtain evidence supporting Corporate Bank's hotel rates.  Cashon reported to the DynCorp Board that Corporate Bank "[r]efused, on a regular basis,

to provide the basic information concerning ownership documentation of leased facilities," and "[s]imply ignored requests for supporting documentation for invoices," among other problems.

62.     FAR 52.242-3(c) (incorporated into the CIVPOL contract and into Corporate Bank's subcontract) and FAR 31.201-2 obligated DynCorp and Corporate Bank to maintain records sufficient to show that the costs it proposed and subsequently charged to the government for Corporate Bank's hotels were reasonable.  DynCorp did not meet these obligations.  Even after Al-Katin was dissolved and Corporate Bank claimed to own the hotels, DynCorp kept its head in the sand and failed to obtain the required supporting documentation from Corporate Bank that would justify its proposed rates.  DynCorp nonetheless included these same inflated hotel rates in each successive proposal for continued services under the CIVPOL contract, as set forth in Exhibit A.

63.     Likewise, even after DynCorp made inquiries regarding comparable properties and discovered that hotels were available for much cheaper rates, DynCorp continued to charge Corporate Bank's inflated hotel rates to the government.  This was contrary to DynCorp's obligations under FAR 52.216-7 (incorporated into the CIVPOL contract and into Corporate Bank's subcontract), FAR 31.201, and FAR 31.204, which required DynCorp to only charge reasonable costs to the government.  The public vouchers containing these unreasonable hotel rates are listed in Exhibit B.

**B.     Unreasonable Local National Labor Rates**

64.     Corporate Bank used local national employees to perform security, driving, and translation services for its CIVPOL subcontract with DynCorp.  DynCorp knowingly failed its obligation as a prime contractor to ensure that the rates Corporate Bank charged for these employees were reasonable.  Moreover, DynCorp knowingly made material false statements and

key omissions about these unreasonable labor rates that distorted its negotiations with the State

Department.  Accordingly, DynCorp submitted false claims worth millions of dollars. DynCorp's

false claims to the State Department for inflated labor rates are listed in Exhibit B.

### i. Subcontract Labor Rates for April 17, 2004 to July 16, 2004

65.     On or about April 1, 2004, DynCorp signed a modification to a sub-task order

with Corporate Bank that set Corporate Bank's local national labor rates.  Corporate Bank used

these rates to bill DynCorp for local national labor for the period from April 17, 2004 to July 16,

2004.

66.     On June 3, 2004, DynCorp submitted a proposal to the State Department for TO

0338, which covered the April 17, 2004, to July 16, 2004, period of the CIVPOL contract.  In

this proposal, DynCorp falsely represented that Corporate Bank's labor rates were based on

"historical data" and constituted some of DynCorp's "Other Direct Costs."  In fact, DynCorp's

proposal quoted markedly higher labor rates than those that Corporate Bank had agreed to bill

DynCorp on April 1, 2004, as well as the rates Corporate Bank actually charged DynCorp.

Therefore, the rate DynCorp quoted to the State Department did not reflect DynCorp's costs.

67.     In addition, the rate quoted by DynCorp was not supported by historical data.

Since the beginning of the DASM contract, all of the rates DynCorp negotiated with Corporate

Bank were significantly less than what DynCorp quoted to the State Department.

68.     As a result of DynCorp's submission of material false information during price

negotiations for this period, the State Department paid over a million dollars in false claims for

the services of security guards, drivers, and interpreters**.**  DynCorp profited by recovering its own

markups and fees on its subcontractor's inflated charges.

### ii.   Subcontract Labor Rates for May 17, 2005 to May 31, 2008

69.     DynCorp recognized that Corporate Bank's labor rates for the period of May 17, 2005 to May 31, 2008, were unsupported, uncompetitive, and fraudulent.  DynCorp nonetheless accepted these labor rates and used them throughout the CIVPOL contract to distort its negotiations with the State Department.  Because DynCorp knowingly made false statements and omitted crucial information about the labor rates, the government could not make fully informed decisions when negotiating with DynCorp or paying its claims.  DynCorp thus induced the State Department to accept the proposed labor rates and pay DynCorp's subsequent claims.

70.     On April 28, 2005, DynCorp, by and through its senior management, including Tim Crawley (Vice President for Contracts Administration) and John Supina (Senior Vice President for Business Administration), accepted a substantial increase in Corporate Bank's labor rates.  As a result of this increase, the monthly rate for security guards and drivers more than tripled, while the monthly rate for interpreters nearly doubled.  DynCorp, by and through Crawley and Supina, also accepted expensive monthly labor rates for local national supervisors and personal security detail ("PSD") guards.  The rates went into effect on May 17, 2005. DynCorp included these newly increased rates in its subsequent price proposals and revised price proposals.

71.     Although DynCorp informed the State Department about other changes in the rate structure it proposed for the performance period spanning from May 17, 2005, to July 15, 2005, it did not inform the government that Corporate Bank's labor rates had essentially tripled. Instead, on June 20, 2006, DynCorp told the State Department that "[a]ll proposed ODCs [or other direct costs] for this extension period are consistent with previous periods for procurement," including the "Corporate Bank Subcontract."  This statement was false, as the

19

increased labor rate ensured that Corporate Bank's guard, driver, and interpreter services were substantially more expensive than those previously quoted and billed to the State Department under CLIN 0043.  For example, the price for three months of guard services at the Baghdad Hotel and Al-Sadeer hotels increased from $1,314,147 to $5,027,750.  Interestingly, the amount listed under the "Corporate Bank Subcontract" section of the ODC tab remained fairly constant – but that was only because DynCorp had stopped counting the hotels in this section, and used a three-month period of time for its numbers instead of a four-month period.

72.     DynCorp thus distorted its negotiations with the State Department – not only by failing to mention the substantial disparity between Corporate Bank's prior labor rates and the rates now proposed, but also by making an affirmative false statement that the prices were "consistent."

73.     Despite the drastic escalation of Corporate Bank's labor rates on May 17, 2005, and DynCorp's obligation under FAR 15.404-3(b)(1) to ensure that Corporate Bank's prices were reasonable, DynCorp failed to establish the reasonableness of Corporate Bank's proposed subcontract prices before accepting them.  DynCorp, for example, did not obtain certified cost or pricing data, or other than cost and pricing data, from Corporate Bank, nor did it examine historical pricing data prior to accepting Corporate Bank's labor rates or seek to compete the requirements.  DynCorp only began to analyze whether Corporate Bank's labor rates were reasonable on or around June 26, 2005, <u>after</u> it had already accepted Corporate Bank's rates and proposed them to the State Department on June 13, 2005.

74.     DynCorp eventually drafted a so-called "Determination of Price Reasonableness" that attempted to explain Corporate Bank's already-accepted rates, and finalized the document on or around July 9, 2005.  Rather than demonstrate that the rates were reasonable, however,

DynCorp's "determination" actually highlighted how egregious the rates were, and demonstrated DynCorp's failure to exercise adequate oversight of its subcontractor.  For instance, the document notes that Corporate Bank refused to provide DynCorp with information about the insurance charge in its labor rate, including the supposed policy which was the basis for the charge, yet DynCorp nevertheless accepted these unsubstantiated costs "as proposed" by Corporate Bank.

75.     Likewise, in conjunction with DynCorp's post-hoc "Determination of Price Reasonableness," Corporate Bank failed to provide DynCorp with any agreements underlying the salaries it paid to its local national employees.  Corporate Bank claimed that the "direct salaries" component of the labor rate came from an agreement that Corporate Bank had with its own subcontractor, Sandi Security Company.  DynCorp, however, could not locate this agreement or get Corporate Bank to produce it.  DynCorp accepted the local national direct salary rates nonetheless, and did not tell the State Department that Corporate Bank's increased labor rates included components that DynCorp failed to substantiate.

76.     In an email dated July 8, 2005, Tim Crawley told Corporate Bank that "the competition" was paying significantly less per month per local national employee than what DynCorp charged to the United States for Corporate Bank's labor, and that "Corporate Bank must be competitive with the market."

77.     Nonetheless, DynCorp did not inform the State Department of the same thing – that the overall labor rates Corporate Bank proposed were not competitive with the market in Iraq or that Corporate Bank did not provide support for its labor rates.  Rather, DynCorp submitted price proposals and revised price proposals to the State Department that contained the same inflated, uncompetitive labor rates.  DynCorp presented these rates as if they were

reasonable, with the justification of a "vendor quote."  This justification was fundamentally misleading because DynCorp knowingly omitted the crucial qualifying information that the quoted rates were uncompetitive and contained undocumented costs.

78.     Additionally, DynCorp knew or should have known that Corporate Bank essentially negotiated the local national direct salary rates with itself because Corporate Bank jointly owned and managed its ostensible labor subcontractor, Sandi Security Company.  When DynCorp questioned Corporate Bank about its labor rate and its supposed labor subcontractor in January 2006, Corporate Bank asked DynCorp to "clarify what subcontractor [DynCorp] has in mind if not [Corporate Bank]."  Yet DynCorp senior management, by and through Tim Crawley and John Supina, among others, accepted Corporate Bank's "direct salaries" nonetheless.  Moreover, DynCorp repeatedly quoted Corporate Bank's inflated direct salary rates to the State Department without disclosing Corporate Bank's self-dealing to the government.

79.     DynCorp also knew that Corporate Bank was actually paying its local national employees significantly less than the salaries DynCorp accepted and incorporated into the labor rates it proposed to the government.  Throughout the CIVPOL contract period, Corporate Bank paid its local national workers significantly less than it charged DynCorp for their labor.  For example, in an internal email dated July 9, 2005, a DynCorp employee stationed in Iraq confirmed the "rumor" that Corporate Bank was not paying its local national employees their proper salaries.  A DynCorp Finance Director also noted, in an internal email from April 1, 2007, that Corporate Bank's "contracts states [sic] that they are paying their security guys who guard us a certain rate," only for DynCorp to "find out that CB is paying significantly less than they said to their employees."

80.     DynCorp never informed the State Department of its concerns about the discrepancies between Corporate Bank's contract labor rates and what it actually paid its workers.  For instance, in emails exchanged internally by DynCorp on September 19, 2006, DynCorp's CIVPOL Contract Manager informed Richard Cashon and other DynCorp executives that Corporate Bank's knowing failure to pay the negotiated salaries appeared to be fraud.  But when DynCorp issued its next price proposal for continuing CIVPOL services to the State Department on September 22, 2006 – just three days later – it included the very same salaries that its own CIVPOL contract manager questioned as potentially fraudulent, and justified the rates as coming from a "vendor quote."

81.     DynCorp negotiated marginally lower labor rates with Corporate Bank for the periods of performance spanning August 12, 2006, to May 31, 2008.  However, DynCorp knew that these rates were still inflated with unsupported and fraudulent costs, including "direct salaries" that Corporate Bank's local national employees never received.  DynCorp continued to quote the inflated labor rates in its price proposals to the State Department, and continued to do so with the crucial qualifying information that would have helped the State Department understand that the rates were unreasonable.

82.     In June 2007, the charges for Corporate Bank local national labor under the CIVPOL contract were transferred from the firm fixed price CLIN 0043 to cost-reimbursable CLIN 0040.  DynCorp was obligated under FAR 52.242-3(c) not to propose the labor rates if they contained unallowable costs.  Likewise, DynCorp was further obligated under FAR 52.216-7, FAR 31.201, and FAR 31.204 to ensure that its charges for Corporate Bank's local national labor were reasonable and, therefore, allowable.  DynCorp knew that Corporate Bank's labor rates were still not reasonable, yet charged them to the government nonetheless.

83.     DynCorp knowingly submitted price proposals and revised price proposals to the State Department containing unreasonable labor rates by way of documents dated June 13, 2005; August 1, 2005; February 6, 2006; March 10, 2006; May 15, 2006; August 4, 2006; August 7, 2006; September 22, 2006; September 25, 2007; and November 29, 2007.  Even though DynCorp knew otherwise, it presented the rates as reasonable and justified on the basis of a "vendor quote."  DynCorp omitted from its proposals, however, the crucial qualifying information that the labor rates were unsupported, uncompetitive, and fraudulent.

84.     DynCorp's various deceptions cost the government millions of dollars in false and fraudulent overcharges, while allowing DynCorp to increase its profits by billing its own overhead and profit on top of the already inflated labor rates.

### C.     Unreasonable G&A Rates

85.     DynCorp's proposals and charges to the government for Corporate Bank's hotels and labor services included additional amounts for Corporate Bank's G&A cost rate.  G&A costs are costs a business incurs that are not directly attributable to a single specific contract, task order, or other cost objective, but rather to intermediate or two or more final cost objectives. FAR 2.101.  Corporate Bank applied a provisional G&A rate to its prices for its hotels, labor, and other services that ostensibly captured such administrative expenses.

86.     DynCorp senior managers, including John Supina, Tim Crawley, Scott Cassara (DynCorp Finance Executive), and Michael Thorne (DynCorp CFO and Treasurer), knew that Corporate Bank's G&A rates were unreasonably high and exceeded its actual G&A costs.

87.     Based on Corporate Bank's disclosed management and administrative expenses, DynCorp originally estimated in July 2003 that Corporate Bank would have a G&A rate of 5 percent for the DASM contract.  Nonetheless, DynCorp allowed Corporate Bank to charge an 11

percent G&A rate for 2003 to ensure that Corporate Bank recovered the indirect expenses that it allegedly incurred.

88.     This 11 percent rate relied on the fiction that all of Corporate Bank's indirect costs were attributable to its work on DASM, even though senior management employees at DynCorp, including Crawley, Supina, Cashon, Cassara, and Thorne, knew that Corporate Bank had other business, including other government contracts *with DynCorp*.   Nonetheless, DynCorp failed to allocate a share of these costs to other contracts – as required by FAR 31.201 and FAR 31.204 – when helping Corporate Bank fabricate its G&A rate for 2003.

89.     Senior management employees of DynCorp, including Supina, Crawley and Cassara, among others, continued to accept an 11 percent G&A rate for Corporate Bank in 2004 on the CIVPOL contract, even though they knew it did not reflect Corporate Bank's actual administrative expenses.  In an email from November 1, 2004, Crawley told Corporate Bank that it could not possibly have suffered financially in 2004, given that its revenues had tripled but DynCorp still continued "to use your 11% G&A rate which was calculated on a revenue basis that was one third of what you have recognized in the operating year."

90.     In 2005, senior management employees of DynCorp, including Crawley, Supina, and Cassara, again permitted Corporate Bank to charge an 11 percent G&A rate, even though Corporate Bank's direct costs had increased substantially.  As a general rule, as the size of the base (direct costs) increases, the G&A rate will decrease because the fixed expenses are being spread over a larger base.

91.     As early as July 2003, DynCorp had assured the State Department that Corporate Bank had agreed to use Government accounting software to account for Corporate Bank's costs.

But DynCorp knew, during both the DASM and CIVPOL contract performance, that the subcontractor's actual administrative capabilities were, in fact, sorely lacking.

92.     On May 19, 2005, Crawley, Supina, and Cassara received a report from a former Defense Contracting Audit Agency (DCAA) auditor that concluded that Corporate Bank's accounting capabilities were woefully inadequate for government contracting.  Among other identified problems, the former DCAA auditor observed that Corporate Bank did not adequately identify costs as G&A or direct costs in its accounting system, did not identify unallowable costs per FAR 31.201, and did not have an adequate "labor charging system" or "timekeeping procedures."  These findings were consistent with DynCorp's own observations, as DynCorp's finance staff reported to management in July 2005 that they were "a little bewildered [by] the fact that we have to generate Corporate Bank invoices for them given the 11% G&A that Corporate Bank charges."  Although DynCorp failed to impart this information to the State Department, it nonetheless passed on Corporate Bank's improperly inflated G&A costs to the State Department.

93.     Notwithstanding its recognition that the 11 percent G&A rate was too high, DynCorp allowed Corporate Bank to raise its G&A rate to 13 percent after August 12, 2006. DynCorp originally told Corporate Bank that it would only accept the 13 percent rate following (a) documentation from a third party auditing firm that reflected Corporate Bank's actual G&A rate for 2005, (b) a "thorough explanation" of the two percent increase, and (c) DynCorp's review and approval of the audit.  Ultimately, however, senior management employees of DynCorp, including Supina, Cassara, and Thorne, among others, accepted the 13 percent rate based solely on a letter from the personal accountant of Corporate Bank's owner that did not

convey Corporate Bank's total G&A costs or provide any sort of analysis that DynCorp could review.

94.     By accepting a G&A rate that it knew was excessive and by allowing it to be incorporated into Corporate Bank's hotel and labor charges, DynCorp violated its obligation under FAR 15.404-3(b) to establish the reasonableness of Corporate Bank's prices.  Moreover, by knowingly including Corporate Bank's unreasonable G&A costs in the price proposals it submitted to the State Department, DynCorp violated its obligation under FAR 52.242-3(c) to keep unreasonable subcontract costs out of its proposals.  DynCorp also knowingly distorted the negotiating process with the State Department by omitting crucial information about Corporate Bank's administrative capabilities and accounting practices.  DynCorp ultimately made false claims for payment of, and received payment for, Corporate Bank's unreasonable G&A costs, even though, under FAR 52.216-7, FAR 31.201, and FAR 31.204, it was only supposed to obtain payment for reasonable and allocable costs.

95.     As with Corporate Bank's inflated hotel and labor rates, Corporate Bank's use of an unreasonably high G&A rate did not result in any loss to DynCorp.  On the contrary, DynCorp profited, because it applied its own profit and overhead rates as a percentage markup to Corporate Bank's labor rate charges, many of which already had been inflated by Corporate Bank.  The State Department bore the loss for these unjustified prices, as DynCorp knowingly passed on millions of dollars of unjustified and inflated charges under the CIVPOL contract.

## CLAIMS FOR RELIEF

### Count I:  Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)
### (pre-May 20, 2009), by Submission of False Claims

96.     The United States re-alleges and incorporates herein by reference paragraphs 1 through 95.

97.     By agreeing to subcontractor hotel and labor rates and general and administrative rates that it knew were unreasonable, proposing those same rates and implicitly representing them as reasonable when negotiating with the State Department, and subsequently charging the rates to the State Department, DynCorp presented or caused to be presented knowingly, recklessly, or with deliberate ignorance materially false or fraudulent claims to the United States under the CIVPOL contract, in violation of the FCA, 31 U.S.C. § 3729(a)(1).  As a result of this misconduct, the United States paid false claims that were inflated or not entitled to be reimbursed.

98.     By virtue of these false claims, the United States suffered damages in an amount to be determined at trial.  Pursuant to the FCA, DynCorp is liable for three times the damages sustained by the government, plus a civil penalty of not less than $5,500 and up to $11,000 for each FCA violation.  31 U.S.C. § 3729(a).

### Count II:  False Claims Act, 31 U.S.C. § 3729(a)(1)(B),
### by Making or Using False Records or
### Statements Material to a False or Fraudulent Claim

99.     The United States re-alleges and incorporates herein by reference paragraphs 1 through 98.

100.     By making material misrepresentations and omissions about its subcontractor oversight and the reasonableness of Corporate Bank's hotel and labor rates, and general and

administrative rates, DynCorp knowingly made or caused to be made false statements and false records material to false claims to the United States under the CIVPOL contract, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B).  As a result of this misconduct, the United States paid false claims that were inflated or not entitled to be reimbursed.

101.    By virtue of these false statements and records, the United States suffered damages in an amount to be determined at trial.  Pursuant to the FCA, DynCorp is liable for three times the damages sustained by the government, plus a civil penalty of not less than $5,500 and up to $11,000 for each violation.  31 U.S.C. § 3729(a).

### Count III:  Unjust Enrichment

102.    The United States re-alleges and incorporates herein by reference paragraphs 1 through 101.

103.    During the period of January 2004 through March 2008, DynCorp made false statements to the government and presented falsely inflated invoices for payment for work performed by its subcontractor, Corporate Bank, and markups that DynCorp added to these falsely inflated claims.

104.    DynCorp has paid Corporate Bank millions in government funds for housing, labor rates and G&A that were falsely inflated, which amount the government would not have paid if it had known about the inflated billings, overcharges, and payments.

105.    DynCorp received an inflated fee from the State Department as a result of the excessive amounts billed for work performed by Corporate Bank and the false claims presented by DynCorp for its Corporate Bank subcontract.

106.    DynCorp has been unjustly enriched by reason of the government's erroneous and mistaken payment of monies to DynCorp.

107.     DynCorp is therefore liable to the government for the amount of its unjust enrichment, together with costs and interest.

### Count IV:  Payment by Mistake

108.     The United States re-alleges and incorporates herein by reference paragraphs 1 through 107.

109.     During the period of April 2004 through December 2008, DynCorp has made false statements to the State Department and presented invoices for payment that contained false statements and claims.

110.     Based upon these false statements and false claims for payment, the United States has mistakenly paid DynCorp millions of dollars.

111.     The United States paid these funds to DynCorp under the mistaken belief that the proposals made by DynCorp to the State Department were based upon reasonable and allowable costs and prices when they were not.  DynCorp is therefore liable to the United States for the amounts the government paid to DynCorp by mistake for overcharges and false claims for hotels, labor, and general and administrative costs in connection with its subcontracts with Corporate Bank, and DynCorp's own markup on those inflated prices, together with costs and interest for monies the government would not have paid if it had known about the inflated billings and overcharges.

### Count V:  Breach of Contract

112.     The United States re-alleges and incorporates herein by reference paragraphs 1 through 111.

113.    The CIVPOL contract permitted DynCorp to bill the government only for allowable, and thus reasonable and allocable, subcontractor costs.  The CIVPOL contract also required DynCorp to negotiate reasonable subcontractor prices.

114.    DynCorp claimed costs under the CIVPOL contract which were not allowable, reasonable, or allocable.  DynCorp's claims for these costs constitutes a breach of the CIVPOL contract.

115.    DynCorp also allowed its subcontractor to charge unreasonable rates.  This distorted price negotiations and constituted a breach of the CIVPOL contract.

116.    By reason of DynCorp's breach, the United States suffered damages in an amount to be determined at trial.

**WHEREFORE**, plaintiff, the United States of America, prays that judgment be entered in its favor against the defendants as follows:

A.    On Counts I and II, treble the amount of the United States' damages, plus civil penalties in the amount of $11,000 for each false claim defendant submitted to the government and statements material to false claims;

B.    On Count III, the amount by which defendant has been unjustly enriched by the government's payment of its false claims;

C.    On Count IV and V, the amount of the United States' harm resulting from defendant's conduct, together with costs and interest;

D.    Equitable relief through an accounting of the proceeds of the fraud and the enforcement of a constructive trust and/or equitable lien upon such proceeds, to the extent that the United States' legal remedy proves inadequate;

E.    Any and all other and further relief as the Court may deem just and equitable.

Respectfully submitted,

July 19, 2016

BENJAMIN MIZER
Principal Deputy Assistant Attorney General

CHANNING D. PHILLIPS, D.C. BAR # 415793
United States Attorney for the District of Columbia

DANIEL F. VAN HORN, D.C. BAR # 924092
Civil Chief, District of Columbia

JENNIFER A. SHORT, D.C. Bar # 456884
Assistant United States Attorney
555 Fourth Street, NW
Washington, DC  20530
Tel: (202) 252-2529
Fax: (202) 252-2599


_____/s/_____
MICHAEL D. GRANSTON
MICHAL TINGLE
ELIZABETH RINALDO
BENJAMIN YOUNG
Attorneys, United States Department of Justice
Civil Division
Ben Franklin Station
PO Box 261
Washington, DC 20044
Tel:  (202) 616-0291
Fax: (202) 514-7361