# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

DYNCORP INTERNATIONAL, LLC,

Defendant.

Civil Action No. 16-1473 (ESH)

## MEMORANDUM OPINION

The United States has sued DynCorp International, a government contractor, to recover alleged overcharges and to seek penalties related to DynCorp's billing for services in Iraq. DynCorp had a contract with the United States Department of State ("DOS") to assist in training a new Iraqi civilian police force. The government claims that DynCorp charged it unreasonable rates for lodging and labor provided under the contract. In addition, the government alleges that DynCorp made false statements and omitted material information about the rates that it charged. The complaint asserts violations of the False Claims Act, as well as common law causes of action for unjust enrichment, payment by mistake, and breach of contract. DynCorp has moved to dismiss all claims. For the reasons explained herein, the Court will grant the motion in part and deny it in part. Specifically, the government's unjust enrichment and payment-by-mistake claims are dismissed insofar as they are based on payment of cost-reimbursable charges.

## BACKGROUND

After a competitive bid process, the DOS awarded DynCorp the CIVPOL Iraq contract in 2004. (Compl. at ¶¶ 32-37, ECF No. 1.) Under the contract, DynCorp was to provide lodging,

security, transportation, and other services to support the Iraqi civilian police force. (*Id.*) DynCorp subcontracted the provision of lodging and labor to Corporate Bank Financial Services, Inc. (*Id.* at ¶ 2.) According to the government, however, "DynCorp knew that the rates provided by Corporate Bank . . . for hotel facilities and local national security guards, drivers, interpreters, and managers were unreasonable." (*Id.* at ¶ 4.) The government asserts that DynCorp nonetheless accepted the unreasonable rates because it viewed Corporate Bank as a "strategic partner." (*Id.* at ¶ 49.)

Under the terms of the CIVPOL contract, the process for determining DynCorp's charges to the DOS depended upon the type of service. DynCorp billed for hotel accommodations and for labor after July 2007 under cost-reimbursable line items, which permit a contractor to be reimbursed for its actual costs, provided those costs are reasonable. (*Id.* at ¶¶ 40, 43.) From the beginning of the contract through July 2007, DynCorp billed labor under an undefinitized firm-fixed-price line item, which meant that the price was agreed upon but not until after performance began. (*Id.* at ¶¶ 41-42.) DynCorp submitted price proposals for twelve different periods of performance, as the DOS repeatedly requested extensions of performance. (*Id.* at ¶ 44.)

The complaint alleges that "[t]hroughout its CIVPOL performance, DynCorp acknowledged internally that Corporate Bank's hotels were overpriced and not competitive with market rates in Baghdad." (*Id.* at ¶ 57.) On February 1, 2005, Senior Vice President Spence Wickham wrote in an internal email that the CEO needed "to be brought to the reality of the markup on our current hotels" and that "DynCorp would not be able to 'win the CIVPOL Iraq business back if we allow these outrageous rates to continue.'" (*Id.*) DynCorp's CIVPOL contract manager noted in October 2005 that Corporate Bank's hotel rates were unacceptable, and the Iraq Support Manager stated in March 2006 that hotels just down the street were

significantly cheaper.  (*Id.* at ¶ 58.)  A DynCorp administrator observed that Corporate Bank's

rates were double the price of standard hotel rooms in Baghdad.  (*Id.*)  Furthermore, Vice

President for CIVPOL Operations Richard Cashon reported to DynCorp's Board of Directors

that Corporate Bank regularly refused to provide documentation supporting its rates.  (*Id.* at

¶ 61.)  Nevertheless, DynCorp charged the DOS the rates that Corporate Bank claimed for the

hotels, without disclosing that they were uncompetitive.  (*Id.* at ¶¶ 52, 55, 59.)  "Instead, in a

letter dated February 24, 2005, Tim Crawley, DynCorp's Vice President for Contract

Administration, told the DOS that DynCorp was unable 'to negotiate rates below the current

level,' because the 'market is dictating the rate.'"  (*Id.* at ¶ 59.)

Similarly, the government alleges that "DynCorp knowingly made material false

statements and key omissions about [the] unreasonable labor rates that distorted its negotiations

with the State Department."  (*Id.* at ¶ 64.)  In the price proposal dated June 3, 2004, which

covered the period from April 17, 2004, to July 16, 2004, DynCorp stated that Corporate Bank's

labor rates were "based on 'historical data.'"  (*Id.* at ¶ 66.)  However, according to the

government, "DynCorp's proposal quoted markedly higher labor rates than those that Corporate

Bank had agreed to bill DynCorp on April 1, 2004."  (*Id.*)  The quoted rates were also

significantly higher than those that DynCorp had negotiated with Corporate Bank over the course

of its previous contract in support of the DOS in Iraq.  (*Id.* at ¶ 67.)

On April 28, 2005, DynCorp "accepted a substantial increase in Corporate Bank's labor

rates," which meant that "the monthly rate for security guards and drivers more than tripled,

while the monthly rate for interpreters nearly doubled."  (*Id.* at ¶ 70.)  Yet, DynCorp informed

the government that its costs "for this extension period are consistent with previous periods."

(*Id.* at ¶ 71.)  "Interestingly, the amount listed under the 'Corporate Bank Subcontract' section

. . . remained fairly constant — but that was only because DynCorp had stopped counting the hotels in this section, and used a three-month period of time for its numbers instead of a four-month period." (*Id.*)

DynCorp submitted price proposals for labor that justified the rates "on the basis of a 'vendor quote'" on the following occasions: June 13, 2005, August 1, 2005, February 6, 2006, March 10, 2006, May 15, 2006, August 4, 2006, August 7, 2006, September 22, 2006, September 25, 2007, and November 29, 2007. (*Id.* at ¶ 83.) Yet, according to the government, DynCorp knew that the competition was paying significantly lower rates, that Corporate Bank's rates were inflated because of self-dealing with a jointly owned subcontractor, and that Corporate Bank was not actually paying its employees the salaries that DynCorp incorporated into the rates it proposed to the government. (*Id.* at ¶¶ 76, 78-80.) In June 2007, the charges for Corporate Bank labor were transferred from the fixed-price line item to a cost-reimbursable line item. (*Id.* at ¶ 82.)[1] The government alleges that "DynCorp knew that Corporate Bank's labor rates were still not reasonable, yet charged them to the government nonetheless." (*Id.*)

"Dyncorp's proposals and charges to the government for Corporate Bank's hotels and labor services included additional amounts for Corporate Bank's G&A cost rate. G&A costs are costs a business incurs that are not directly attributable to a single specific contract, task order, or other cost objective . . . ." (*Id.* at ¶ 85.) DynCorp estimated in 2003 that Corporate Bank would have a G&A rate of 5 percent, but it accepted an 11 percent G&A rate in 2004 for the CIVPOL contract. (*Id.* at ¶¶ 87, 89.) On November 1, 2004, a senior manager at DynCorp told Corporate

---

[1] The complaint is not consistent about whether labor charges were transferred from the fixed-price line item to the cost-reimbursable line item in June or July 2007. (*Compare* Compl. at ¶¶ 41, 43 *with id.* at ¶ 82.) For ease of reference in this Memorandum Opinion, the Court will refer to the two types of labor charges as "before July 2007" and "after July 2007."

Bank that "it could not possibly have suffered financially in 2004, given that its revenues had tripled but DynCorp still continued 'to use your 11% G&A rate which was calculated on a revenue basis that was one third of what you have recognized in the operating year.'" (*Id.* at ¶ 89.) DynCorp allowed Corporate Bank to raise its G&A rate to 13 percent after August 12, 2006, despite the fact that it did not provide documentation of its total G&A costs or "any sort of analysis that DynCorp could review." (*Id.* at ¶ 93.)

The government alleges that "[b]y misrepresenting and omitting information reflecting the true nature and bases of Corporate Bank's rates, DynCorp skewed price negotiations with the State Department and caused the State Department to agree to higher contract prices than it otherwise would have." (*Id.* at ¶ 6.) According to the government, "DynCorp knowingly passed on millions of dollars of unjustified and inflated charges under the CIVPOL contract." (*Id.* at ¶ 95.) An exhibit to the complaint lists the invoices that the government alleges are false. (*See* Compl. Ex. B.) On the basis of these activities, the government asserts five causes of action: violation of the False Claims Act, 31 U.S.C. § 3729(a)(1) (2006), by presenting false claims (Count I); violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(b), by making or using false records or statements material to a false claim (Count II); unjust enrichment (Count III); payment by mistake (Count IV); and breach of contract (Count V).

DynCorp has moved to dismiss each of the government's claims. (Def.'s Mot. Dismiss, ECF No. 10; Def.'s Mem., ECF No. 10-1.) First, DynCorp argues that the government has not adequately pled the falsity, materiality, and scienter elements of the False Claims Act counts. (Def.'s Mem. at 15-36.) Second, DynCorp contends that those counts must be dismissed for failure to allege fraud with particularity. (*Id.* at 37.) Third, DynCorp asserts that for some allegedly false claims, the False Claims Act counts are barred by the statute of limitations. (*Id.* at

38-45.)  Fourth, DynCorp asks the Court to dismiss the unjust enrichment and payment-by-mistake claims on the ground that an express contract existed between the parties.  (*Id.* at 45-46.)  Finally, DynCorp argues that this Court lacks subject matter jurisdiction over the claim for breach of contract.  (*Id.* at 46-48).

## ANALYSIS

The Court will address the False Claims Act counts and then each of the common law causes of action.  Beginning with the FCA presentment claim (Count I), the Court finds that the government has adequately alleged falsity, materiality, and scienter under an implied certification theory for the cost-reimbursable charges and a fraudulent inducement theory for the fixed-price charges.  The Court next concludes that the complaint also satisfies any additional intent requirement for the FCA false statement claim (Count II).  The government's False Claims Act allegations satisfy Rule 9's particularity requirements and are not, based on the face of the complaint, conclusively time-barred.  Thus, these counts will not be dismissed.  Next, the Court addresses the claims for unjust enrichment and payment by mistake (Counts III and IV), and it concludes that those claims must be dismissed to the extent they are based on the cost-reimbursable charges.  Finally, the Court finds that it has jurisdiction over the breach of contract claim (Count V).

## I.    STANDARD OF REVIEW

In deciding a motion to dismiss, the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *Ord v. Dist. of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The

Court must be able "to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id.*  In fraud cases, Rule 9(b) imposes the additional requirement that the

plaintiff "must state with particularity the circumstances constituting fraud or mistake. Malice,

intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R.

Civ. P. 9(b).

## II.    FALSE CLAIMS ACT

In Counts I and II, the government asserts claims under two different sections of the False

Claims Act: the presentment provision and the false statement provision.  (*See* Compl. at ¶¶ 96-

101 (citing 31 U.S.C. § 3729(a)(1) (2006); 31 U.S.C. § 3729(a)(1)(B) (2012)).)  These two

sections are similar in many ways, and DynCorp has not distinguished them for purposes of most

of its arguments.  For the sake of clarity, the Court addresses each provision separately and

concludes that neither Count I nor Count II should be dismissed.

### A.  Presentment of False Claims (Count I)

At the time of the activities alleged in this case, section 3729(a)(1) imposed liability on

anyone who "knowingly presents, or causes to be presented, to an officer or employee of the

United States Government or a member of the Armed Forces of the United States a false or

fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1) (2006).  "The elements of a

presentment claim are that '(1) the defendant submitted a claim to the government, (2) the claim

was false, and (3) the defendant knew the claim was false.'"  *United States ex rel. Folliard v.*

*CDW Tech. Servs.*, 722 F. Supp. 2d 20, 26 (D.D.C. 2010) (quoting *United States ex rel. Westrick*

*v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 134 (D.D.C. 2010)).  Although the

statute does not state that the falsity must have been material, many courts have read into the

statute a materiality requirement, which is often treated as part of the falsity element. I John T. Boese, *Civil False Claims & Qui Tam Actions* § 2.04 (4th ed. updated 2017); *see, e.g.*, *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1269, 1271 (D.C. Cir. 2010) ("*SAIC*"); *United States ex rel. Shemesh v. CA, Inc.*, 89 F. Supp. 3d 36, 45 (D.D.C. 2015) ("*Shemesh I*"). DynCorp does not dispute that the government has adequately alleged the submission of claims to the government, but it does challenge the sufficiency of the government's allegations as to falsity (including materiality) and scienter. (*See* Def.'s Mem.)

The government's complaint asserts the presentment provision for dozens of allegedly false claims, which include several different types of charges. (*See* Compl. Ex. B.) In the complaint, the government categorizes the charges as hotel, labor, or G&A (which was added to either hotel or labor charges). (*Id.* at ¶¶ 52-95.) The complaint further distinguishes charges as billed under either cost-reimbursable or fixed-price line items. (*Id.* at ¶¶ 39-43.) DynCorp billed for hotel accommodations and for labor after July 2007 under cost-reimbursable line items. (*Id.* at ¶¶ 40, 43.) From the beginning of the contract through July 2007, DynCorp billed labor under a firm-fixed-price line item. (*Id.* at ¶ 42.) DynCorp's motion to dismiss distinguishes cost-reimbursable charges from fixed-price ones on the basis of their different regulatory treatment, and as a result, it makes different legal arguments for the two categories of charges. To address DynCorp's arguments, the Court will also divide its analysis between cost-reimbursable and fixed-price charges.

i.     *Cost-Reimbursable Charges (Hotels, Labor after July 2007, and G&A)*

DynCorp argues that the government's claims as to the cost-reimbursable charges do not satisfy the falsity, materiality, or scienter requirements for section 3729(a)(1). In particular, DynCorp contends that the government has not adequately alleged that the charges were

unreasonable, an unreasonable charge is not false, reasonableness is not material to payment, and DynCorp could not have known that its charges would be found to be unreasonable. (*See* Def.'s Mem. at 15-36.) As explained below, the Court rejects these arguments and finds that the government has adequately alleged the elements of its claim under an implied certification theory.

a.  Falsity

Rather than identifying any express false statements in DynCorp's claims for payment, the government argues that it can demonstrate the falsity of the claims using either an implied certification theory or a fraudulent inducement theory. (Gov.'s Opp. at 18-23, ECF No. 12.) The Supreme Court recently considered whether a defendant could be liable under the False Claims Act without ever making an express false statement. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). In *Escobar* the Court held that "the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 2001.

Although DynCorp claims that specific representations are necessary to proceed on a theory of implied certification (*see* Def.'s Mem. at 23), this is not the law of the D.C. Circuit. Prior to *Escobar*, the D.C. Circuit held that "to establish the existence of a 'false or fraudulent' claim on the basis of implied certification of a contractual condition, the FCA plaintiff . . . must show that the contractor withheld information about its noncompliance with material contractual requirements." *SAIC*, 626 F.3d at 1269. Because the Supreme Court in *Escobar* held that the

implied certification theory was satisfied "at least" under the conditions it described and did "not resolve whether all claims for payment implicitly represent that the billing party is legally entitled to payment," *Escobar*, 136 S. Ct. at 2000-01, the D.C. Circuit's broader statement of the implied certification theory remains good law after *Escobar*. Thus, the government can show falsity by demonstrating that (1) a contractor withheld information about its noncompliance with contractual or regulatory requirements; and (2) those contractual or regulatory requirements were material.[2]

The government alleges that regulations required DynCorp's charges to be reasonable, but that DynCorp made claims for payment of unreasonable charges while withholding information about their unreasonableness. (Compl. at ¶¶ 21-27, 52-95.) According to the government, "[t]he Federal Acquisition Regulation ('FAR') is the principal regulation that governs United States government contracts, including the CIVPOL contract." (*Id.* at ¶ 21.) "[T]he CIVPOL contract incorporated by reference FAR 52.216-7 (Allowable Cost and Payment) (February 2002), which permits reimbursement of costs only to the extent they are allowable under FAR Subpart 31.2." (*Id.* at ¶ 23.) Under FAR Subpart 31.2, "[a] cost is allowable only when the cost complies with all of the following requirements," one of which is "[r]easonableness." 48 C.F.R. § 31.201-2(a). "A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business." 48 C.F.R. § 31.201-3(a). Either when making initial payments or during the audit process prior to final payment, the government may reduce payments by the amounts that it finds are not allowable costs. 48 C.F.R. § 52.216-7(a), (g). If a claimed cost is "expressly

---

[2] Under this test from the D.C. Circuit, materiality is a requirement for falsity rather than an independent element of the claim. *See SAIC*, 626 F.3d at 1269.

unallowable" — that is, "specifically named and stated to be unallowable" — penalties are assessed against the contractor. 48 C.F.R. §§ 52.242-3(d), 31.001.

DynCorp does not dispute that its cost-reimbursable charges were required to be reasonable, but it argues that the government has not adequately pled that the claimed charges were unreasonable. (*See* Def.'s Mem. at 24-28.) DynCorp is wrong. The government has alleged that high-level DynCorp employees stated that the hotel rates were "outrageous" and that the labor rates were not competitive with the market. (Compl. at ¶¶ 57, 76.) The government has also alleged that the G&A rate was inflated by failing to take into account all of Corporate Bank's revenue. (*Id.* at ¶¶ 88-90.) Taking all inferences in favor of the plaintiff, it is plausible that the costs DynCorp claimed were not reasonable. Since the government has also alleged that DynCorp withheld the unreasonableness of its rates from the government (*see* Compl. at ¶¶ 52, 59, 77, 81-82, 92, 94), the complaint satisfies the first requirement for falsity under the implied certification theory: it alleges that a contractor withheld information about its noncompliance with contractual or regulatory requirements.

Falsity under the implied certification theory also requires a second element: materiality. In *Escobar*, the Supreme Court held that "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." 136 S. Ct. at 2002. "The materiality standard is demanding." *Id.* at 2003. It is not sufficient for a finding of materiality "that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* Rather, it is relevant whether the government "consistently refuses to pay claims . . . based on noncompliance with the particular . . . requirement" or, on the contrary, "regularly pays a particular type of claim in full despite actual knowledge that certain

requirements were violated." *Id.* at 2003-04. "Materiality, in addition, cannot be found where noncompliance is minor or insubstantial." *Id.* at 2003.

A few district courts have addressed whether claims for unreasonable costs are false, but they did so before the Supreme Court articulated the materiality standard in *Escobar*, and their results have been inconsistent. One case involved allegations of a defendant's "knowing presentation of invoices for payment to the Government that consisted of unallowable and unreasonable costs," while "keep[ing] the Government in the dark about its excess materials and wasteful ordering." *United States ex rel. Howard v. KBR, Inc.*, 139 F. Supp. 3d 917, 943, 945 (C.D. Ill. 2015). The judge acknowledged that reasonableness is highly contestable and "a prudent businessperson may make mistakes and incur costs based on decisions that in retrospect were unwise." *Id.* at 943. However, given allegations that high-level employees sought to keep the government in the dark about the wasteful ordering because they knew that auditors would likely find fault with them, the judge concluded that the unreasonable claims could be "objectively false." *Id.* at 942-43.

In another case, a relator alleged that the contractor had accepted a subcontractor for bottled water whose bid price was more than three times the quoted price submitted by the lowest bidder. *United States ex rel. Garzione v. PAE Gov. Servs., Inc.*, 164 F. Supp. 3d 806, 809-10 (E.D. Va. 2016). That court concluded that the contractor had not made a false implied certification of reasonableness because "it would appear that payment is conditioned upon the Contracting Officer's determination of 'reasonableness,' not [the contractor]'s 'certification' of reasonableness." *Id.* at 815 n.8. That literalist approach no longer seems valid after *Escobar*, which was issued two months after *Garzione* and clarified that "[w]hether a provision is labeled a condition of payment is relevant to but not dispositive of the materiality inquiry." 136 S. Ct. at

2001. Instead, the focus of the materiality inquiry is on the government's likely or actual behavior in response to a misrepresentation. *Id.* at 2002-04.

Based on a consideration of the factors outlined in *Escobar*, this Court concludes that a claim for costs that are significantly higher than reasonable satisfies the materiality requirement. The fact that "the Government would have the option to decline to pay" is relevant but not sufficient to find materiality. *Escobar*, 136 S. Ct. at 2003. Therefore, the FAR's provision for contracting officers to refuse to pay unreasonable costs is one indication that unreasonableness may be material to some claims, but it does not automatically render unreasonableness material in every instance. "Materiality . . . cannot be found where noncompliance is minor or insubstantial." *Id.* at 2003. Especially given that reasonableness is subjective, a contracting officer's determination that costs are unreasonable will not equate with substantial noncompliance in every instance. Rather, a contractor's claimed costs must be significantly higher than reasonable in order to conclude that there was substantial noncompliance.

Furthermore, the government's practice is important to the evaluation of materiality. *Escobar*, 136 S. Ct. at 2003-04. Contrary to DynCorp's argument, the fact that the government frequently pays charges when they are billed and claws back unreasonable charges later does not demonstrate that reasonableness is immaterial. (*See* Def.'s Mem. at 16-20.) That would be like saying that because the IRS sometimes pays tax refunds before conducting audits, it does not care whether tax returns are accurate. Whether the government chooses to pay before it audits is an administrative matter. Therefore, information can qualify as material based on its capacity to influence either the initial or the final payment decision. That said, the government's established procedure for disallowing unreasonable costs through the audit process without assessing penalties suggests that it considers disagreements about reasonableness to be a routine element of

13

the contracting process. This bolsters the Court's conclusion that only claims for costs that are significantly higher than reasonable warrant condemnation as "false" under the False Claims Act.

The government has adequately alleged that DynCorp's claimed costs for hotels, labor after July 2007, and G&A were significantly higher than reasonable, so those claims satisfy *Escobar*'s materiality standard. For hotel rates, statements by high-level DynCorp employees that the Corporate Bank rates were "outrageous" and twice the price of other hotel rooms are sufficient at the complaint stage to infer that the hotel rates were significantly higher than reasonable. (*See Compl.* at ¶¶ 57-58.) For labor rates, DynCorp employees allegedly stated that the competition was paying significantly less and that Corporate Bank itself was paying significantly less to its employees than it had told DynCorp. (*Id.* at ¶¶ 76, 78-80.) Although these allegations relate to rates before July 2007, the government alleges that labor rates after July 2007 were only "marginally lower" than earlier rates. (*Id.* at ¶ 81.) Therefore, taking all inferences in favor of plaintiff, the Court can infer that labor rates after July 2007 were significantly higher than reasonable. For G&A rates, the government alleges that DynCorp calculated that the rate should be 5 percent, but it nevertheless allowed Corporate Bank to charge 11 percent, which was based on a calculation that ignored Corporate Bank's revenue from other contracts. (*Id.* at ¶¶ 87-88.) It continued to allow 11 percent when Corporate Bank's revenue tripled, which should have decreased the G&A rate. (*Id.* at 89-90.) Finally, it permitted an increase to 13 percent without any justification from Corporate Bank. (*Id.* at ¶ 93.) Again, the Court can infer that the rates were significantly higher than reasonable. Therefore, the government's complaint adequately pleads falsity, including *Escobar* materiality, for the cost-reimbursable charges (hotels, labor rates after July 2007, and G&A).

b. Scienter

A presentment action under the False Claims Act requires not just a false claim but also that the defendant presented it "knowingly." 31 U.S.C. § 3729(a)(1) (2006). The False Claims Act defines knowingly to include "actual knowledge of the information," "deliberate ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information." *Id.* § 3729(b). Proof of specific intent to defraud is not required. *Id.* "Establishing knowledge . . . on the basis of implied certification requires the plaintiff to prove that the defendant knows (1) that it violated a contractual obligation, and (2) that its compliance with that obligation was material to the government's decision to pay." *SAIC*, 626 F.3d at 1271. "[U]nder the FCA, 'collective knowledge' provides an inappropriate basis for proof of scienter" because it "allows 'a plaintiff to prove scienter by piecing together scraps of 'innocent' knowledge held by various corporate officials, even if those officials never had contact with each other or knew what others were doing in connection with a claim seeking government funds.'" *Id.* at 1274-75 (quoting *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 918 n. 9 (4th Cir. 2003) ("*Savannah River Co. II*")). On the other hand, "actual knowledge possessed by individual company employees" or a conclusion that "the company acted recklessly" based on "the actions of employees or [the company's] systems and structure" would be sufficient. *Id.* at 1276. To address concerns about potentially open-ended liability in implied certification cases, the Supreme Court and the D.C. Circuit have both emphasized that courts should engage in "strict enforcement" of the scienter requirement. *Escobar*, 136 S. Ct. at 2002; *SAIC*, 626 F.3d at 1270.

The government has adequately alleged the first part of the scienter requirement — knowledge of a contractual or regulatory violation — by alleging that high-level DynCorp

employees made statements about the rates being significantly higher than reasonable. Senior Vice President Spence Wickham referred to the hotel rates as "outrageous," DynCorp's CIVPOL contract manager noted that the rates were unacceptable, and other officials stated that cheaper hotel rooms were available elsewhere. (Compl. at ¶¶ 57, 58.) Tim Crawley, DynCorp's Vice President for Contract Administration, told Corporate Bank that the competition was paying significantly less for labor. (*Id.* at ¶¶ 59, 76.) DynCorp executives also knew that Corporate Bank was paying significantly less to its employees than the salaries it had agreed upon, and DynCorp's CIVPOL Contract Manager referred to that practice as fraud. (*Id.* at ¶¶ 79-80.) Although these statements about labor rates predated July 2007, it is reasonable to infer that the executives knew that the rates continued to be unreasonable after July 2007. In addition, the Court can infer DynCorp's knowledge that G&A rates were unreasonable from the government's allegations that DynCorp estimated Corporate Bank should have a much lower G&A rate than what it accepted, and a senior manager at DynCorp commented to Corporate Bank about the high rate. (*Id.* at ¶¶ 87, 89.) These statements all suggest actual knowledge that the rates were significantly higher than reasonable. Since the CIVPOL contract incorporated the FAR's reasonableness requirements by reference (*see* Compl. at ¶ 23), DynCorp executives who knew that the rates were unreasonable either had actual knowledge that such rates violated the contract or acted with reckless disregard.

Taking all inferences in favor of the plaintiff, the Court can also infer that DynCorp had the requisite scienter that significant noncompliance with reasonableness requirements would be material to the government's payment decisions. First, it is common sense that the government would not pay claims if it knew that they were outrageously excessive. Second, the regulatory provisions for the government to refuse to pay unreasonable charges confirm that reasonableness

is material to payment.  *See* 48 C.F.R. § 52.216-7(a), (g).  DynCorp either had actual knowledge of these regulations or was reckless for failing to learn about the regulations governing its contract.  Contrary to DynCorp's argument, the fact that the government frequently pays charges when they are billed and claws back unreasonable charges after the audit process could not have indicated to DynCorp that reasonableness was immaterial.  (*See* Def.'s Mem. at 30.)  Rather, it merely demonstrated that the government was willing to assume that charges were proper until an audit revealed otherwise.

This case does not present the "collective knowledge" problem that the D.C. Circuit identified in *SAIC*.  That Court was concerned about attributing knowledge to a company based on "piecing together scraps of 'innocent' knowledge held by various corporate officials."  *SAIC*, 626 F.3d at 1274-75 (quoting *Savannah River Co. II*, 352 F.3d at 918 n. 9).  Here, taking the government's allegations as true, individual employees' knowledge was not innocent. According to the complaint, high-level executives knew that DynCorp was charging excessively unreasonable rates, and those same executives were at least reckless with respect to the materiality of such noncompliance with regulatory requirements.

In sum, the complaint satisfies the elements of a presentment claim based on the cost-reimbursable charges.  Under a theory of implied certification, the government has adequately alleged falsity (including *Escobar* materiality) and scienter.

ii.      *Fixed-Price Charges (Labor before July 2007)*

With respect to the fixed-price charges, DynCorp again argues that the government has not adequately alleged the falsity, materiality, or scienter requirements of section 3729(a)(1).  In addition to the arguments on those elements that it made for the cost-reimbursable charges, it also contends that the FAR reasonableness provisions do not apply to fixed-price charges, so

there can be no false implied certifications of reasonableness. (Def.'s Mem. at 24-25.) Turning to the allegedly false affirmative statements, DynCorp argues that they were not false or made with knowledge, and they did not induce the government to accept and pay inflated rates. (Def.'s Reply at 3-6.) The Court concludes that the government has adequately alleged a presentment claim as to the fixed-price charges under a fraudulent inducement theory.

a. Falsity

For fixed-price charges, the Court finds that the implied certification theory does not apply, but the government has set forth a claim under a fraudulent inducement theory. The problem with applying the government's implied certification theory to fixed-price charges is that the regulatory provisions about reasonableness do not apply to prices in the same way that they apply to costs. In evaluating the government's implied certification theory as applied to DynCorp's cost-reimbursable charges, the Court relied on FAR Subpart 31.2, which states that "[a] *cost* is allowable only when the *cost* complies with all of the following requirements," one of which is "[r]easonableness." 48 C.F.R. § 31.201-2(a) (emphasis added). "A *cost* is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business." *Id.* § 31.201-3(a) (emphasis added). The government points the Court to a provision which states that the cost principles in FAR Part 31 "shall be used in the pricing of fixed-price contracts, subcontracts, and modifications to contracts and subcontracts whenever (a) cost analysis is performed, or (b) a fixed-price contract clause requires the determination or negotiation of costs." *Id.* § 31.102. However, the government never alleges or argues in its opposition that either of the conditions specified in section 31.102 applies to the fixed-price contract terms at issue here. (*See* Gov.'s Opp. at 17.)

Despite the fact that the plain language of these FAR reasonableness provisions does not

indicate any application to the fixed-price terms, the government argues that "cost principles should apply." (Gov.'s Opp. at 17.). According to the government, "even though [the line item for labor before July 2007] was denominated as a fixed price [line item], it was more akin to a cost [line item] because performance began before costs were negotiated." (*Id.*) But because the government has not alleged that the fixed-price line item for labor stated that it required any determination or negotiation of costs, as opposed to a negotiation of price, the government's argument seems to be merely a policy argument (not a legal requirement under FAR Subpart 31.2) that reasonableness requirements ought to apply to undefinitized fixed-price line items. Since the alleged fixed-price labor charges are not legally required to comply with the reasonableness provisions in FAR Subpart 31.2, there can be no implied certification of compliance with those provisions.

As an alternative, the government directs the Court to another FAR provision, which states that "[t]he prime contractor or subcontractor shall . . . [c]onduct appropriate cost or price analyses to establish the reasonableness of proposed subcontract prices" and "[i]nclude the results of these analyses in the price proposal." 48 C.F.R. § 15.404-3. This provision does not support the government's implied certification theory. First, it directs contractors and subcontractors to perform analyses of reasonableness, but it does not state that offered prices must be reasonable. Nor has the government provided any authority to support an argument that implied certifications of compliance with anything other than explicit statutory, regulatory, or contractual provisions would be legally sufficient. Second, because this provision directs contractors to submit the results of their analyses in their price proposals, there is no implied certification that a contractor has made any evaluation of reasonableness other than what it reports in the proposal. Therefore, under an implied certification theory, the government has not

sufficiently alleged the falsity of DynCorp's fixed-price charges.

Instead, the Court must turn to the government's fraudulent inducement theory. Under a fraudulent inducement theory, a contractor is liable "for each claim submitted to the Government under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves." *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005). There are two major variations of the fraudulent inducement theory. *See United States ex rel. Morsell v. Symantec Corp.*, 130 F. Supp. 3d 106, 120-21 (D.D.C. 2015). One type requires that "a party makes promises at the time of contracting that it intends to break." *See United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 196 (D.D.C. 2011). The other type requires that false statements "induced the government to make the initial contract" or caused it to agree on particular contract terms or modifications. *See United States ex rel. Westrick v. Second Chance Body Armor Inc.*, 128 F. Supp. 3d 1, 18 (D.D.C. 2015). For example, this Court previously found that the government had stated a claim based on the fraudulent inducement theory when it alleged that the contractor's false statements about its typical discounting practices led the government to agree to inflated prices. *Shemesh I*, 89 F. Supp. 3d at 47-52. Here, the government's theory is of this second type.

According to the government, its agreement as to fixed-price labor rates was induced by false statements in DynCorp's price proposals. (Gov.'s Opp. at 19-23.) In the complaint, the government has identified three different types of allegedly false statements and has specified the dates of the price proposals in which each type appears. The Court finds that the complaint adequately pleads falsity for some, but not all, of the statements.

First, in the price proposal dated June 3, 2004, DynCorp stated that the labor rates for Corporate Bank were based on "historical data." (Compl. at ¶ 66.) However, according to the

government, "DynCorp's proposal quoted markedly higher labor rates than those that Corporate Bank had agreed to bill DynCorp on April 1, 2004." (*Id.* at ¶ 66.)  The quoted rates were also significantly higher than those that DynCorp had negotiated with Corporate Bank over the course of its previous contract supporting the work of the DOS in Iraq.  (*Id.* at ¶ 67.)  In response to the government's allegation of falsity, DynCorp argues that it was permitted to propose higher prices for labor than what Corporate Bank actually charged.  (Def.'s Reply at 17-18.)  According to DynCorp, it would never make a profit without charging the government more than Corporate Bank charged DynCorp, and furthermore, contractors are expected to propose prices that take into account the possibility that their costs will increase during the period of the fixed-price contract.  (*Id.*)

The government has plausibly alleged that the reference to "historical data" was false. According to the complaint, DynCorp "bill[ed] its own overhead and profit on top of the already inflated labor rates." (Compl. at ¶ 84.)  Assuming that to be true, there is no basis for DynCorp's argument that it had to inflate the labor rates to make a profit.  The government alleges that DynCorp submitted the price proposal on June 3, 2004, and that it covered the period from April 17, 2004, to July 16, 2004.  (*Id.* at ¶ 66.)  Given that the price was set for a period of only three months and that the proposal was submitted when half of that period had already passed, the Court can reasonably infer that DynCorp should not have needed to build in a significant margin to cover a change in costs after agreement was reached upon the price.  Thus, taking all inferences in favor of the government at this stage, the term "historical data" could be understood to mean that the proposed prices were consistent with historical costs, while the government's allegations support an inference that this was not the case.

Second, the government alleges that DynCorp falsely informed the government on June

20, 2005, that its rates "for this extension period are consistent with previous periods." (Compl. at ¶ 71; *see* Gov.'s Opp. at 11 n.1.) In fact, DynCorp had "accepted a substantial increase in Corporate Bank's labor rates," which meant that "the monthly rate for security guards and drivers more than tripled, while the monthly rate for interpreters nearly doubled." (*Id.* at ¶ 70.) Given the alleged increase in rates, the Court concludes that the government has adequately pled falsity.

Third, the government alleges that DynCorp submitted price proposals for labor that presented the rates as "justified on the basis of a 'vendor quote'" on the following occasions: June 13, 2005, August 1, 2005, February 6, 2006, March 10, 2006, May 15, 2006, August 4, 2006, August 7, 2006, September 22, 2006, September 25, 2007, and November 29, 2007. (Compl. at ¶ 83.) According to the government, DynCorp knew that the competition was paying significantly lower rates, that Corporate Bank's rates were inflated because of self-dealing with a jointly owned subcontractor, and that Corporate Bank was not actually paying its employees the salaries that DynCorp incorporated into the rates proposed to the government. (*Id.* at ¶¶ 76, 78-80.) The government's allegations do not permit a reasonable inference that the references to "vendor quote" were false. That language merely suggests that the proposed price is based on a quote from the vendor, Corporate Bank. Although the government has alleged that Corporate Bank charged unreasonably inflated rates, it has not alleged that the prices DynCorp proposed to the government on the identified dates were inconsistent with the rates that Corporate Bank quoted to DynCorp. Indeed, the government alleges that "DynCorp repeatedly quoted Corporate Bank's inflated direct salary rates to the State Department . . . ." (*Id.* at ¶ 78.) Therefore, the government has adequately pled the falsity of the references to "historical data" and "consistent with previous periods," but not "vendor quote."

Falsity of *statements in price proposals* does not end the inquiry, because DynCorp's *claims for payment* are only considered false if the prior false statements caused the government to award the contract to DynCorp or to agree on certain contractual terms. *See Second Chance Body Armor*, 128 F. Supp. 3d at 18. Some courts also refer to this causation requirement as materiality. *See, e.g.*, *Shemesh I*, 89 F. Supp. 3d at 51-52. The government alleges that "[b]y misrepresenting and omitting information reflecting the true nature and bases of Corporate Bank's rates, DynCorp skewed price negotiations with the State Department and caused the State Department to agree to higher contract prices than it otherwise would have." (Compl. at ¶ 6.) During the time that DynCorp billed labor under the fixed-price line item, the price for the labor was a term of the contract. (*See id.* at ¶ 42.) Since DynCorp submitted separate price proposals for 12 different periods of performance (*see id.* at ¶ 44), the Court must evaluate whether the alleged false statements could plausibly have induced the government's agreement on labor prices for each period of performance.

For the period from April 17, 2004, to July 16, 2004, DynCorp's price proposal contained the allegedly false justification that the rates were based on "historical data." (Compl. at ¶ 66.) One of the primary methods that the government is supposed to use to evaluate whether to accept a price is "[c]omparison of the proposed prices to historical prices paid, whether by the Government or other than the Government, for the same or similar items." 48 C.F.R. § 15.404-1(b)(2)(ii). Therefore, at the complaint stage, the Court can reasonably infer that DynCorp's justification of its proposed prices as based on "historical data" could have induced the government to agree to the prices.

The next period that the government challenges — May 17, 2005, to July 15, 2005 — is the one for which DynCorp is alleged to have falsely told the DOS that its rates "for this

extension period are consistent with previous periods." (Compl. at ¶ 71.) This statement, similar to the "historical data" statement, could have induced agreement because the government evaluates the reasonableness of prices by how they compare to the prices that the government has paid in the past. *See* 48 C.F.R. § 15.404-1(b)(2)(ii). Although one might argue that the government should have compared the new quoted rates to the rates it had paid in the past and thus realized that DynCorp's statement about consistency was inaccurate, the government alleges that DynCorp took steps to conceal the increase in rates. "Interestingly, the amount listed under the 'Corporate Bank Subcontract' section . . . remained fairly constant — but that was only because DynCorp had stopped counting the hotels in this section, and used a three-month period of time for its numbers instead of a four-month period." (Compl. at ¶ 71.) Taking all inferences in favor of the plaintiff, it can be inferred that the government relied on DynCorp's statement about consistency and thus it could have induced the government's agreement on prices.

For the remainder of the period when labor was charged under the fixed-price line item, the government's only allegation of falsity in the price proposals deals with the "vendor quote" justifications. (*See* Compl. at ¶ 83.) The Court has already determined that the complaint does not adequately allege that it was false to refer to the rates as based on a "vendor quote," so that language cannot support a fraudulent inducement theory. However, the facts alleged in the complaint support an inference that the government's agreements on prices for periods after July 2005 would have been fraudulently induced by the allegedly false statement on June 20, 2005, that the proposed rates were "consistent with previous periods." (*See* Compl. at ¶ 71.) Once the government accepted the prices for May to July 2005, the contracting officer was to use those prices as a benchmark to evaluate subsequent price proposals pursuant to 48 C.F.R. § 15.404-1(b)(2)(ii). As a result, it is plausible that the fraudulent inducement of the first price agreement

would in turn induce subsequent price agreements.

Thus, the complaint adequately pleads fraudulent inducement of the government's agreement on all challenged labor prices under the fixed-price line item. In response, DynCorp argues that the government has not adequately pled that DynCorp's claims for payment were false, because "the Government does not allege that DI actually charged the allegedly fraudulent rates in its proposals." (Def.'s Reply at 3-5.) In fact, the government does allege that "[e]ach of [DynCorp's price] proposals reflected the various rates for Corporate Bank's services, and DynCorp generally used the rates when billing the State Department for Corporate Bank's services." (Compl. at ¶ 3.) Although "DI believes that for many time periods, it billed the Government based on the actual charges it received from Corporate Bank — thus affording the Government the benefit of lower rates, even though the contract contained higher fixed rates that DI would have been permitted to charge" (Def.'s Reply at 18 n.7), the Court cannot dismiss the government's claim simply because DynCorp disputes the facts. The complaint plausibly alleges that DynCorp's false statements induced the government to accept higher labor prices than it otherwise would have. Therefore, it adequately alleges that the claims for fixed-price labor charges were false under a theory of fraudulent inducement.

b. Scienter

Like all presentment claims, a claim based on a fraudulent inducement theory requires scienter. *United States ex rel. Harrison v. Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999) ("*Savannah River Co. I*"). Since section 3729(a)(1) imposes liability only on defendants who "knowingly" present false claims, the defendant in a fraudulent inducement case must have known that the statements inducing the agreement were false. *See id.* at 791; *Shemesh I*, 89 F. Supp. 3d at 49-51. As explained above, knowledge for False Claims Act purposes includes

deliberate ignorance or reckless disregard for the truth or falsity of information. 31 U.S.C.

§ 3729(b); *Savannah River Co. I*, 176 F.3d at 785. Collective knowledge by employees within a

company is not sufficient. *SAIC*, 626 F.3d at 1274-75; *see supra* Part II.A.i.b.

In *Shemesh I*, this Court found adequate allegations of scienter in a case that involved a

similar theory of fraudulent inducement. *See* 89 F. Supp. 3d 36. There, the relator's theory was

that the contractor fraudulently induced agreement on inflated contract prices by providing

inaccurate information about the company's standard pricing policies. *Id.* at 47-52. Although

"relator had[d] failed to identify a specific employee who knew he or she was submitting a false

claim for payment or was making a false statement to the government," the Court noted

allegations that the company's policy was to offer substantial discounts on its list prices and that

high-level employees stated this policy. *Id.* at 50-51. These allegations were "sufficient . . . for

the Court to reasonably infer that [the contractor's] employees knew that the pricelist was not a

current and accurate representation of [the contractor's] pricing practices and that all claims

submitted pursuant to the MAS contract were false." *Id.* at 51. Similarly, the Court can

reasonably infer that DynCorp employees knew their statements about proposed prices were

false and therefore claims using those prices were false.

Based on the allegations in the complaint, DynCorp either had actual knowledge or acted

with reckless disregard for the truth of its statements about "historical data" and consistency with

previous periods. With respect to the price proposal containing the justification based on

"historical data," the government alleges that just two months before the proposal, DynCorp and

Corporate Bank had agreed on much lower labor rates than those in the proposal. (Compl. at

¶ 66.) In addition, the proposed rates were significantly higher than those that DynCorp had

negotiated with Corporate Bank for a similar contract over the course of the previous year. (*Id.*

at ¶¶ 28, 67.)  That DynCorp had actual knowledge of both the proposed rates and the historical rates is not enough for scienter, because independently those are innocent pieces of information. However, if the DynCorp employees preparing the price proposal described the proposed prices as based on "historical data" without actually checking the prices that DynCorp had agreed upon with Corporate Bank in the recent past, they acted with reckless disregard for the truth of the description.  If they did check those recent prices, they had actual knowledge of the discrepancy between historical rates and the proposal.  In either case, the scienter requirement is satisfied.

With respect to DynCorp's statement that its proposed labor prices for the period from May 17, 2005, to July 15, 2005, were "consistent with previous periods for procurement" (Compl. at ¶ 71), the government alleges that DynCorp had recently agreed to increase the rates significantly.  "On April 28, 2005, DynCorp, by and through its senior management, including Tim Crawley (Vice President for Contracts Administration) and John Supina (Senior Vice President for Business Administration), accepted a substantial increase in Corporate Bank's labor rates.  As a result of this increase, the monthly rate for security guards and drivers more than tripled, while the monthly rate for interpreters nearly doubled." (*Id.* at ¶ 70.)  Assuming the truth of these allegations, DynCorp again either had actual knowledge that the statement about consistency was wrong, or it was reckless for failing to check the rates for prior periods before making a statement about the comparison.

Thus, the government has adequately alleged the elements of a presentment claim for the fixed-price charges.  Under a theory of fraudulent inducement, the complaint alleges the falsity of claims (including false statements and causation), as well as scienter.

### B.  False Statements (Count II)

In addition to suing DynCorp for its allegedly false claims under the presentment

provision of the False Claims Act (Count I), the government also challenges the same conduct under the false statement provision of the Act (Count II). The false statement provision was amended in 2009, and the parties dispute which version applies to this case. Before May 20, 2009, the provision was codified at 31 U.S.C. § 3729(a)(2) and created liability for anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." Since the enactment of the Fraud Enforcement and Recovery Act (FERA) on May 20, 2009, the provision has been codified at 31 U.S.C. § 3729(a)(1)(B) and creates liability for anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

A presentment claim and a false statement claim reach similar conduct, but the false statement claim is easier to prove in some ways while harder in other ways. On the one hand, whereas a presentment claim requires that the defendant "presents, or causes to be presented," a false claim to the government, 31 U.S.C. § 3729(a)(1) (2006), the false statement claim allows someone else to have presented the false claim, as long as the defendant made a false statement. The false statement claim is a "safety net designed to cover 'knowing' conduct that is used to support false claims even though the defendant does not directly present the false claim." Boese, *supra*, § 2.01[C]. On the other hand, a false statement claim requires the additional elements that the defendant made a false statement and that the statement was "to get a false or fraudulent claim paid" (before May 20, 2009) or "material" to the false claim (after May 20, 2009). *Compare* 31 U.S.C. § 3729(a)(2) (2006) *with* 31 U.S.C. § 3729(a)(1)(B) (2012). A plaintiff cannot recover under both the presentment provision and the false statement provision for the same conduct, but it can plead both claims in the alternative. *United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 6 (D.D.C. 2003).

DynCorp has made only one argument about why Count II should be dismissed even if Count I is not dismissed. The only argument that is unique to Count II is that the pre-FERA version of the false statement provision applies to this case and that the government has not adequately alleged the specific intent required by that provision. (*See* Def.'s Mem. at 32-36.)

A year before Congress passed FERA, the Supreme Court interpreted the pre-FERA false statement provision to require that the defendant had the "purpose" of getting a false claim paid. *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 668-69 (2008). "[A] plaintiff asserting a § 3729(a)(2) claim must prove that the defendant *intended* that the false record or statement be material to the Government's decision to pay or approve the false claim." *Id.* at 665 (emphasis added). Congress reacted to *Allison Engine* by changing the language of the provision to require merely that the false statement be "material" to the false claim. *See* 31 U.S.C. § 3729(a)(1)(B) (2012); *Folliard*, 722 F. Supp. 2d at 34. Although the amendment containing the materiality language was enacted on May 20, 2009, Congress provided that it "shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act that are pending on or after that date." 31 U.S.C. § 3729 note (citation omitted). The opinion in *Allison Engine* was issued on June 9, 2008. *See* 553 U.S. 662.

The applicability of the pre-FERA intent requirement to this case depends on whether the retroactivity provision's reference to pending "claims" refers to cases or claims for payment. The government filed its complaint against DynCorp on July 19, 2016. (*See* Compl.) If "claims" means cases, the pre-FERA intent requirement does not apply to any of the false claims that the government has alleged in this case, because the case was pending after June 7, 2008. However, DynCorp had submitted nearly all of the allegedly false claims for payment before June 7, 2008. (*Id.* Ex. B.) The government has not alleged whether any of those claims for

payment remained pending after June 7, 2008.  But, if "claims" means claims for payment, the pre-FERA intent requirement applies to the allegedly false claims that were no longer pending on June 7, 2008.

Courts have split on whether FERA's amendment to the false statement provision is retroactive to cases or to claims for payment pending after June 7, 2008.  As Judge Wilkins has noted, the majority of circuits have interpreted "claims under the False Claims Act" to refer to cases, but the majority of judges in this district have interpreted it to refer to claims for payment. *United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 46 (D.D.C. 2014).  The primary arguments for the latter interpretation are that § 3729(b)(2) defines a "claim" as a "request or demand . . . for money or property," and the retroactivity provision specifies that another amendment "shall apply to cases pending on the date of enactment."  *See, e.g.*, *United States v. Science Applications Int'l Corp.*, 653 F. Supp. 2d 87, 106-07 (D.D.C. 2009), *vacated in part and remanded on other grounds*, 626 F.3d 1257 (D.C. Cir. 2010).  The primary arguments for interpreting "claims under the False Claims Act" to mean cases are that "[t]here is no such thing as a request or demand for payment under the False Claims Act," and interpreting FERA as retroactive to cases makes Congress's chosen date logical because it "eliminate[s] the approach taken in *Allison Engine* without reopening judgments that were already final when *Allison Engine* was decided."  *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 639-41 (7th Cir. 2016).

At this stage, it is not necessary for the Court to take a position on the proper interpretation of the retroactivity provision.  As the Court explained in a previous case, it "can think of few situations where a party would submit a claim for payment directly to the government without intending that the government pay it." *Folliard*, 722 F. Supp. 2d at 35.

Here, taking all inferences in favor of the plaintiff, the Court can reasonably infer that if DynCorp knowingly submitted outrageous costs while withholding information about their unreasonableness, it did so with the intent that the government not realize the outrageousness of the costs and therefore pay the claims. Likewise, the Court can reasonably infer that a contractor who provides justifications for its prices does so with the intent that the government accept the justifications and agree to the proposed prices. Because the government's complaint satisfies the pre-FERA intent requirement, the Court need not decide at this point whether the pre-FERA intent requirement actually applies. The Court concludes that none of DynCorp's arguments regarding falsity, materiality, or scienter warrant dismissal of Count II.

### C. Particularity

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The D.C. Circuit has interpreted the rule to require that the "pleader . . . state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994) (quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981)). "Rule 9(b) does not require plaintiffs to allege every fact pertaining to every instance of fraud when a scheme spans several years." *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1259 (D.C. Cir. 2004). Rather, plaintiffs must provide "sufficient information to allow for preparation of a response." *Id.* at 1256 (quoting *Joseph*, 642 F.2d at 1385).

DynCorp argues that "the Complaint does not allege with particularity the contents of

each voucher, or how the vouchers were supposedly false, or why the alleged falsity was material." (Def.'s Mem. at 37.) However, there was no reason for the complaint to make separate allegations about each individual claim for payment, because the government's allegations apply to whole categories of claims. Furthermore, the government is permitted to rely on specific examples to support its allegations. *See Martin-Baker Aircraft Co.*, 389 F.3d at 1259. Thus, it was adequate for the government to allege that rates were unreasonable over a period of time and to support that allegation with statements by DynCorp executives about the outrageousness of rates at particular times, rather than providing specific information about each challenged rate.

Next, DynCorp contends that "[t]he Complaint also fails to allege, for each purportedly false voucher, the specific portion of the Corporate Bank charge that was purportedly unreasonable." (Def.'s Mem. at 37.) But DynCorp has provided no legal basis for requiring an FCA plaintiff to plead the precise amount of its damages. That information is neither an element of the government's claims, nor necessary to allow DynCorp to prepare a defense. The government has provided an extremely detailed complaint that lists every claim for payment alleged to be false, specifies the affirmative statements or implied certifications that allegedly made the claims false, and quotes statements by DynCorp employees to support an inference of scienter. Nothing more is necessary to satisfy Rule 9(b).

### D.  Statute of Limitations

According to DynCorp, "a significant percentage of the DI invoices that the Government alleges to be false claims — approximately 18 percent — fall outside of the applicable statute of limitations." (Def.'s Mem. at 6.) A civil action for False Claims Act violations "may not be brought — (1) more than 6 years after the date on which the violation of section 3729 is

committed, or (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last." 31 U.S.C. § 3731(b). Here, the complaint alleges that "DynCorp executed tolling agreements with the United States that tolled the running the statute of limitations from January 29, 2011, to [the filing of the complaint]," and "[t]he Department of Justice neither knew nor reasonably should have known facts giving rise to its FCA and common law claims prior to January 29, 2008, or three years prior to the tolled period." (Compl. at ¶¶ 18-19.) DynCorp's argument is that the "official" in § 3731(b)(2) need not be a DOJ official, and the government has failed to allege that no official with responsibility knew or reasonably should have known about the facts. (Def.'s Mem. at 38-44.) It follows, DynCorp says, that the government is constrained by the six-year statute of limitations in § 3731(b)(1), and thus, claims related to invoices submitted before January 29, 2005 (six years before the effective date of the tolling agreement) are untimely. (*Id.* at 44.)

Most courts have concluded that "the official of the United States charged with responsibility to act in the circumstances," 31 U.S.C. § 3731(b)(2), must be an official from the Department of Justice. *See United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 606-08 (S.D.N.Y. 2013); *United States v. Carell*, 681 F. Supp. 2d 874, 881-82 (M.D. Tenn. 2009); *United States v. Tech Refrigeration*, 143 F. Supp. 2d 1006, 1009 (N.D. Ill. 2001); *United States v. Inc. Vill. of Island Park*, 791 F. Supp. 354, 361-64 (E.D.N.Y. 1992). A major reason for this interpretation is that the False Claims Act makes the Attorney General responsible for investigating and prosecuting violations. 31 U.S.C. § 3730(a); *see, e.g.*, *Tech Refrigeration*, 143 F. Supp. 2d at 1009. However, one of these courts emphasized that there was "patently

33

inconsistent authority," *Island Park*, 791 F. Supp. at 363, and another opted for the narrow interpretation of "official" because ambiguous statutes of limitations should be construed in favor of the government, *Carell*, 681 F. Supp. 2d at 882. One judge concluded that senior army officials did qualify as officials charged with responsibility, although the relator had not argued that only DOJ officials should qualify, and the Second Circuit held that the court should have dismissed the case for lack of subject matter jurisdiction without reaching the statute of limitations. *See United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 777 F. Supp. 195, 204-05 (N.D.N.Y. 1991), *affirmed on other grounds by* 985 F.2d 1148 (2d Cir. 1993). A major treatise on the False Claims Act argues that "the official . . . with responsibility to act" should not be limited to DOJ officials, because other government agencies have an important role in investigating fraud. Boese, *supra*, § 5.02[B][2][b].

For purposes of this motion, the Court need not decide whether "the official . . . with responsibility to act" must be a DOJ official. Dismissal on the basis of a statute of limitations "is appropriate only if the complaint on its face is conclusively time-barred." *De Csepel v. Republic of Hungary*, 714 F.3d 591, 603 (D.C. Cir. 2013) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996)). "[T]he statute of limitations is an affirmative defense that does not need to be anticipated and rebutted by the complaint." *M.K v. Tenet*, 196 F. Supp. 2d 8, 13 (D.D.C. 2001). Thus, if a complaint does not indicate when the conditions giving rise to the claim occurred, the court should not dismiss the complaint based on the statute of limitations. *Id.* at 14. The government's False Claims Act suit against DynCorp is not conclusively time-barred, because the complaint does not show when any government official knew or should have known the facts material to these claims. Therefore, it would be premature to dismiss any claims based on the statute of limitations.

In sum, the Court will deny DynCorp's motion to dismiss the government's claims under the False Claims Act. The government's complaint plausibly alleges the elements of a presentment claim and a false statement claim. It does so with sufficient particularity, and these claims are not conclusively time-barred based on the face of the complaint.

## III.    COMMON LAW CAUSES OF ACTION

### A.  Unjust Enrichment and Payment by Mistake

In Count III, the unjust enrichment claim, the government asserts that "DynCorp has been unjustly enriched by reason of the government's erroneous and mistaken payment of monies to DynCorp." (Compl. at ¶ 106.)  In Count IV, the payment-by-mistake claim, the government alleges that "[t]he United States paid these funds to DynCorp under the mistaken belief that the proposals made by DynCorp to the State Department were based upon reasonable and allowable costs and prices when they were not." (*Id.* at ¶ 111.)  DynCorp argues that the Court should dismiss Counts III and IV because quasi-contractual claims cannot proceed when a plaintiff has alleged that the parties had an express contract. (Def.'s Mem. at 45-46.)

Generally, plaintiffs who have alleged the existence of an express contract cannot bring claims for unjust enrichment or payment by mistake, because "the existence of a valid contract between the parties negates the need for the court to imply a contract by law." *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 160-61 (D.D.C. 2011); *United States v. First Choice Armor & Equip., Inc.*, 808 F. Supp. 2d 68, 77-78 (D.D.C. 2011).  There is, however, an exception for False Claims Act cases where the government alleges that the contract was invalid because the defendant fraudulently induced the government to enter into the contract — including an agreement on a particular price. *United States ex rel. Shemesh v. CA, Inc.*, 89 F. Supp. 3d 67, 80-81 (D.D.C. 2015) ("*Shemesh II*"); *Kellogg Brown & Root*, 800 F. Supp. 2d at

160-61.  The government may plead contractual and quasi-contractual claims in the alternative, but it "may not recover damages on legally inconsistent theories."  *Shemesh II*, 89 F. Supp. 3d at 80.

Applying this standard, the Court finds that the unjust enrichment and payment-by-mistake claims can proceed for the fixed-price labor charges but not the cost-reimbursable charges.  As the Court explained in Part II.A.ii, the government has adequately alleged that DynCorp fraudulently induced it to agree to inflated prices for labor under the fixed-price line item.  Once the parties agreed upon a price, it became a term of the contract.  (*See* Compl. at ¶ 42.)  Since the government has alleged that the contractual terms were fraudulently induced, it can pursue quasi-contractual claims with respect to the fixed price labor charges.  In contrast, the government has not alleged fraudulent inducement of any contractual term governing the cost-reimbursable charges.  It does not allege that DynCorp obtained the entire CIVPOL contract by fraud, nor has it argued that DynCorp's submission of costs and the government's payment or rejection of them created any new contractual terms.  Therefore, the Court will dismiss Counts III and IV to the extent that they are based on DynCorp's bills for cost-reimbursable charges.

**B.  Breach of Contract**

The government's final claim is for breach of contract.  According to Count V of the complaint, DynCorp breached the CIVPOL contract by claiming costs that were not reasonable and by allowing its subcontractor to charge unreasonable rates.  (Compl. at ¶¶ 114-15.)  DynCorp contends that this Court has no subject matter jurisdiction over the government's claim for breach of contract.  (Def.'s Mem. at 46-47.)  Under the Contract Disputes Act, jurisdiction over breach of contract claims arising from government contracts exists only in agencies and the U.S. Court of Federal Claims, unless they are claims "involving fraud."  41 U.S.C. §§ 7103(a),

(c), 7104.  When "the same factual allegations form the basis for both the government's FCA claims and breach of contract claims, the CDA jurisdictional limit does not bar the government's breach of contract claim."  *First Choice Armor*, 808 F. Supp. 2d at 80; *Shemesh II*, 89 F. Supp. 3d at 80; *Kellogg Brown & Root*, 800 F. Supp. 2d at 160.  DynCorp argues that the fraud exception is not applicable "because . . . the Government has failed to state a cognizable FCA claim."  (Def.'s Mem. at 47.)  On the contrary, as the Court has concluded that the government has stated cognizable FCA claims, the Court also has jurisdiction over claims for breach of contract that arise from the same facts.

## CONCLUSION

For the foregoing reasons, the Court will deny DynCorp's motion to dismiss the government's complaint, except that it will dismiss Counts III and IV to the extent that they are based on allegations about cost-reimbursable charges.  A separate Order accompanies this Memorandum Opinion.


/s/  *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge


Date:   May 19, 2017