UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
UNITED STATES OF AMERICA,          )
                                                    )
                   Plaintiff,                   )
                                                    )
         v.                                        )          Civil Action No. 16-1473 (PLF)
                                                    )
DYNCORP INTERNATIONAL LLC,      )
                                                    )
                   Defendant.                )
_____)


OPINION

This case arises out of services that DynCorp International LLC ("DynCorp"), a

government contractor, provided to the United States during the Iraq War.  The United States has

brought this action against DynCorp under the False Claims Act, 31 U.S.C. § 3729 et seq., to

recover alleged overcharges and to seek penalties related to DynCorp's billing for services in

Iraq.  In February 2004, during the early period of the Iraq War, the U.S. Department of State

awarded DynCorp a contract to assist the United States with training a new Iraqi civilian police

force.  The United States alleges that DynCorp charged unreasonable rates for lodging and labor

provided under the contract and that DynCorp made false statements and omitted material

information about the rates that it charged.  The complaint asserts violations of the False Claims

Act, as well as common law causes of action, two of which were later dismissed without

prejudice.  See United States v. DynCorp International LLC, 253 F. Supp. 3d 89, 95

(D.D.C. 2017).

In 2022, the parties completed fact and expert discovery.  See November 7, 2022

Joint Status Report [Dkt. No. 119] at 1.  The United States retained expert witness Sam Hadley

to opine on damages.  DynCorp retained expert witness Jeffrey DuVal to rebut Ms. Hadley's damages opinion, and expert witness Michael Kostiw to opine on the relative security of different hotels in Baghdad.  Pending before the Court are the United States' Motion to Exclude Testimony of Defendant DynCorp International LLC's Experts Michael W. Kostiw and Jeffrey S. DuVal [Dkt. No. 140] and DynCorp's Motion to Exclude the Opinions and Testimony of the Government's Proffered Expert on Hotel Costs [Dkt. No. 123].[1]

---

[1]     The Court has reviewed the following documents and accompanying exhibits – sealed and public – in connection with the pending motions:  United States' Complaint ("Compl.") [Dkt. No. 1]; DynCorp International LLC's Answer and Defenses ("Answer") [Dkt. No. 27]; Memorandum in Support of the United States' Motion to Exclude Testimony of Defendant DynCorp International LLC's Experts Michael W. Kostiw and Jeffrey S. Duval ("U.S. Mot.") [Dkt. No. 121-3]; U.S. Mot., Exhibit 1 ("Kostiw Rpt.") [Dkt. No. 121-5]; U.S. Mot., Exhibit 2 ("DuVal Rpt.") [Dkt. No. 121-6]; U.S. Mot., Exhibit 4 ("Kostiw Dep.") [Dkt. No. 121-8]; DynCorp International LLC's Memorandum of Law in Support of Its Motion to Exclude the Opinions and Testimony of the Government's Proffered Expert on Hotel Costs ("DynCorp Mot.") [Dkt. No. 122-2]; Declaration of Benjamin E. Rosenberg in Support of DynCorp International LLC's Motion to Exclude the Opinions and Testimony of the Government's Proffered Expert on Hotel Costs ("Rosenberg Decl.") [Dkt. No. 123-2]; Rosenberg Decl., Exhibit A ("Hadley Rpt.") [Dkt. No. 123-3]; Rosenberg Decl., Exhibit N ("Lease Packet") [Dkt. No. 123-16]; Rosenberg Decl., Exhibit O ("2004 Leases") [Dkt. No. 123-17]; Rosenberg Decl., Exhibit T ("CivPol Contract") [Dkt. No. 123-22]; DynCorp International LLC's Memorandum of Law in Opposition to the Government's Motion in Limine to Exclude the Testimony of DynCorp's Experts Michael Kostiw and Jeffrey DuVal ("DynCorp Opp.") [Dkt. No. 127-2]; United States' Memorandum in Opposition to Defendant DynCorp International LLC's Motion to Exclude the Testimony of the United States' Expert Sam Hadley ("U.S. Opp.") [Dkt. No. 129-2]; U.S. Opp., Exhibit 3 ("Contract Admin. Email") [Dkt. No. 129-6]; U.S. Opp., Exhibit 4 ("Task Order #002") [Dkt. No. 129-7]; U.S. Opp., Exhibit 5 ("Task Order #003") [Dkt. No. 129-8]; U.S. Opp., Exhibit 6 ("Baghdad Mods.") [Dkt. No. 129-9]; U.S. Opp., Exhibit 7 ("Al-Sadeer Mods.") [Dkt. No. 129-10]; DynCorp International LLC's Reply Memorandum of Law in Further Support of its Motion to Exclude the Opinions and Testimony of the Government's Proffered Expert on Hotel Costs ("DynCorp Reply") [Dkt. No. 133-2]; Reply Memorandum in Support of the United States' Motion to Exclude Testimony of Defendant DynCorp International LLC's Experts Michael W. Kostiw and Jeffrey S. DuVal ("U.S. Reply") [Dkt. No. 135-2]; and Transcript of Record, United States v. DynCorp Int'l LLC, Civil Action No. 16-1473 (Sept. 13, 2023) ("Hearing Tr.") [Dkt. No. 151].

Upon careful consideration of the parties' written submissions, the oral arguments presented at a motions hearing on September 13, 2023, and the relevant authorities, the Court will grant in part and deny in part both motions.[2]

## I.    BACKGROUND

In 2003, the United States invaded and occupied Iraq, remaining in the country until U.S. troops were officially withdrawn in 2011. During the Iraq War, the U.S. Department of State ("DoS") aimed to develop a modern civilian police force in Iraq. See U.S. Mot. at 1. On February 18, 2004, after a competitive bidding process, DoS awarded DynCorp a contract to provide lodging, security, transportation, and other services to support the Iraqi civilian police force (the "CivPol Contract"). See Compl. ¶¶ 32-37.[3] At the time of the award, DynCorp had been providing similar services in Iraq under a different contract; the CivPol Contract, however, is the only contract at issue in this case. See U.S. Mot. at 1. After winning the CivPol Contract, DynCorp subsequently subcontracted with Corporate Bank Financial Services, Inc. ("Corporate Bank") to secure lodging for CivPol workers and to supply DynCorp with Iraqi guards, drivers, translators, and other personnel. See id. at 2; Compl. ¶ 2.

According to the United States, "DynCorp knew that the rates provided by Corporate Bank . . . for hotel facilities and local national security guards, drivers, interpreters,

---

[2]    According to DynCorp, its expert Jeffrey DuVal also submitted an initial report regarding the United States' allegation that DynCorp overcharged the government for the labor that DynCorp employed. DynCorp Opp. at 3 n.1. The United States has not moved to exclude Mr. DuVal's report on labor costs.

[3]    DynCorp was acquired in November 2020 by Amentum, another government contractor. DynCorp Mot. at 6 n.2. DynCorp's name was subsequently discontinued, and all related employees and services were transferred to Amentum. Id. The Court will continue to refer to the defendant as "DynCorp" because that was its name during the events relevant to this case. See id.

and managers were unreasonable." Compl. ¶ 4. The government asserts that DynCorp nonetheless accepted the unreasonable rates because it viewed Corporate Bank as a "strategic partner." Id. ¶ 49. According to the government, DynCorp "misrepresent[ed] and omit[ed] information reflecting the true nature and bases of Corporate Bank's rates," id. ¶ 6, and "knowingly passed on millions of dollars of unjustified and inflated charges under the CivPol contract." Id. ¶ 95. With respect to hotel prices, the complaint alleges that "[t]hroughout its CIVPOL performance, DynCorp acknowledged internally that Corporate Bank's hotels were overpriced and not competitive with market rates in Baghdad." Id. ¶ 57.

During the term of the CivPol Contract, the only lodging available to DynCorp was in the "Red Zone," an especially dangerous area of Baghdad. See DynCorp Mot. at 8. Because hotels occupied by non-Iraqis faced the risk of insurgent attacks, DynCorp needed to lease entire hotels for its personnel and close the building complexes to the general public. See id. at 9-10. Corporate Bank secured lodging for DynCorp by leasing all of the rooms at two hotels in Baghdad: the Baghdad Hotel and the Al Sadeer Hotel. See U.S. Mot. at 2. DynCorp housed CivPol personnel in the Baghdad Hotel from April 2004 through May 2007 and in the Al Sadeer Hotel from April 2004 through August 2006. See DynCorp Mot. at 10. Corporate Bank billed DynCorp for rooms at the Baghdad and Al Sadeer Hotels, which DynCorp in turn billed DoS pursuant to a cost-reimbursable CivPol Contract line item. See U.S. Mot. at 2. According to the United States, under Federal Acquisition Regulation (FAR) 31.201-2, costs billed to the government under this line item were only reimbursable if they were "allowable," and costs were "allowable" only if they were, among other requirements, reasonable. Id. The FAR also requires contractors to maintain records "adequate to demonstrate that costs claimed have been incurred." See id. (quoting FAR 31.201-2(d)).

In 2016, DynCorp moved to dismiss the government's claims. The Court denied the motion with respect to the False Claims Act claims but dismissed without prejudice the common law claims. See United States v. DynCorp International LLC, 253 F. Supp. 3d at 95. DynCorp subsequently filed its answer, which included twelve affirmative defenses. See Answer. In response, the United States moved to strike four of these defenses. The Court granted the government's motion in part and struck two affirmative defenses in full and two affirmative defenses in part. See United States v. DynCorp International LLC, 282 F. Supp. 3d 51, 58 (D.D.C. 2017).[4]

## II. LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent has demonstrated by a preponderance of the evidence that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702.[5] "In general, Rule 702 has been interpreted to favor admissibility."

Khairkhwa v. Obama, 793 F. Supp. 2d 1, 10 (D.D.C. 2011); see also FED. R. EVID. 702 advisory

---

[4]    Judge Ellen Segal Huvelle presided over this case until her retirement, at which time the case was reassigned to the undersigned.

[5]    Rule 702 was amended in 2023 to clarify that courts must evaluate the reliability of an expert's methodology and their application of that methodology when determining the admissibility of expert testimony, and that the standard for doing so is preponderance of the evidence. FED. R. EVID. 702 advisory committee note, 2023 amendment. Although the parties filed their Daubert motions before this amendment, the Court will apply Rule 702 as amended because doing so would not "result in manifest injustice." See Wultz v. Bank of China, Ltd., 304

committee note, 2000 amendment ("A review of the caselaw after <u>Daubert</u> shows that the rejection of expert testimony is the exception rather than the rule.").  Trial judges are generally afforded broad discretion in rendering evidentiary rulings "[i]n deference to their familiarity with the details of the case."  <u>Youssef v. Lynch</u>, 144 F. Supp. 3d 70, 80 (D.D.C. 2015); <u>accord</u> <u>Graves v. District of Columbia</u>, 850 F. Supp. 2d 6, 11 (D.D.C. 2011).

Rule 702 of the Federal Rules of Evidence effectively codifies the Supreme Court's decisions in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999).  In <u>Daubert</u>, the Court charged trial judges with the responsibility of acting as "gatekeepers" to shield unreliable or irrelevant expert testimony and evidence from the jury.  <u>See</u> <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. at 597.  In <u>Kumho</u>, the Court made clear that the gatekeeper function applies to all expert testimony, not just scientifically based testimony.  <u>See</u> <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. at 148-49.  Consistent with the Court's role as the "gatekeeper for expert testimony," <u>Little v. Wash. Metro. Area Transit Auth.</u>, 249 F. Supp. 3d 394, 408 (D.D.C. 2017), the Court has "broad discretion in determining whether to admit or exclude expert testimony."  <u>Blake v. Securitas Sec. Servs., Inc.</u>, 292 F.R.D. 15, 16 (D.D.C. 2013) (quoting <u>U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.</u>, 608 F.3d 871, 895 (D.C. Cir. 2010)).

As the D.C. Circuit has explained, the twin requirements for the admissibility of expert testimony are evidentiary reliability and relevance.  <u>Ambrosini v. LaBarraque</u>, 101 F.3d 129, 133 (D.C. Cir. 1996); <u>see</u> <u>United States v. Naegele</u>, 471 F. Supp. 2d 152, 156-57 (D.D.C. 2007); <u>McReynolds v. Sodexho</u>, 349 F. Supp. 2d 30, 34-35 (D.D.C. 2004).  With respect to

---

F.R.D. 38, 42 (D.D.C. 2014) (quoting <u>Moore v. Agency for Int'l Dev.</u>, 994 F.2d 874, 878 (D.C. Cir. 1993).

reliability, the court's focus must be on the methodology or reasoning employed.  See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. at 595; Ambrosini v. LaBarraque, 101 F.3d at 140. With respect to relevance, the court must determine whether the proffered testimony is sufficiently tied to the facts of the case and whether it will aid the jury in resolving a factual dispute.  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. at 591-92.

For an expert to be "qualified" under Rule 702, "it is not necessary that the witness be recognized as a leading authority in the field in question or even a member of a recognized professional community."  29 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 6264.1 (2d ed. 2023).  "[A]n expert may be qualified on the basis of his or her practical experience."  Khairkhwa v. Obama, 793 F. Supp. 2d at 11.  As the "gatekeeper," the trial judge "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho Tire Co. v. Carmichael, 526 U.S. at 152.  Whether there exist "reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."  Id. at 153.

Similarly, Rule 703 permits expert witnesses to present opinions based on inadmissible facts or data "if experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."  FED. R. EVID. 703.  "The expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials.  Otherwise, the expert is simply repeating [inadmissible] evidence without applying any expertise whatsoever, a practice that allows the proponent to circumvent the rules [of evidence]."  Gilmore v. Palestinian Interim Self-Gov't Auth., 843 F.3d 958, 972

(D.C. Cir. 2016) (cleaned up).  In evaluating expert opinions based on inadmissible facts, "the judge must conduct an independent evaluation into [the] reasonableness" of an expert's reliance on those facts.  Wi-LAN Inc. v. Sharp Elecs. Corp., 992 F.3d 1366, 1376 (Fed. Cir. 2021).

In addition, whether expert opinion testimony is admissible "depends, in part, on whether it will 'assist the trier of fact' in either 'understand[ing] the evidence or . . . determin[ing] a fact in issue.'"  Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d 1207, 1212 (D.C. Cir. 1997) (quoting FED. R. EVID. 702).  "[W]here the jury is just as competent to consider and weigh the evidence as is an expert witness and just as well qualified to draw the necessary conclusions therefrom, it is improper to use opinion evidence for the purpose." Gilmore v. Palestinian Interim Self-Gov't Auth., 843 F.3d at 973 (quoting Henkel v. Varner, 138 F.2d 934, 935 (D.C. Cir. 1943)).  Expert testimony consisting of legal conclusions is impermissible because such testimony may improperly influence the decisions of the trier of fact (here, the jury) and impinge upon the responsibilities of the trial court.  See United States ex rel. Mossey v. Pal-Tech, Inc., 231 F. Supp. 2d 94, 98 (D.D.C. 2002).  Thus, "an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d at 1212-13.

### III. DISCUSSION

#### A.  The Parties' Experts and Their Qualifications

The United States has retained Sam Hadley as a government contracts expert to "estimate the damages the State Department incurred because of DynCorp's inflated and excessive lodging costs."  U.S. Opp. at 4.  DynCorp has retained Jeffrey DuVal as a government contracts expert to rebut the opinions of Ms. Hadley, see DynCorp Opp. at 3, and has retained

Michael Kostiw as an expert on "the safety and security of lodging in Baghdad during the period relevant to this case." Id. at 2.

Both parties move to exclude the opinions of the other party's experts, either in whole or in part. Neither party, however, challenges the experts' qualifications. For the following reasons, the Court finds that Sam Hadley, Jeffrey DuVal, and Michael Kostiw are all qualified to testify about their respective areas of expertise. See FED. R. EVID. 702.

### 1.    Sam Hadley

The United States retained Ms. Hadley as a government contracts expert to estimate damages resulting from DynCorp's allegedly excessive hotel costs. See Hadley Rpt. at 1. Ms. Hadley is currently a principal at Capital Project Management, Inc. Id. attach. B (Hadley resume). She has over thirty years of experience in "[c]laims preparation and evaluation involving damages, lost profits, replacement costs and increased costs due to delays and inefficiencies" and "[p]roject accounting and auditing, including government projects." Id. Among other certifications, she is a Certified Public Accountant and a Certified Fraud Examiner. Id. The Court concludes that based on her experience and background, Ms. Hadley is qualified to provide an expert opinion on damages in this case.

### 2.    Jeffrey DuVal

DynCorp retained Mr. DuVal as a government contracts expert to rebut Ms. Hadley's expert report on DynCorp's allegedly excessive hotel costs. See DuVal Rpt. ¶ 1. Mr. DuVal is a partner and co-lead of the government contracts group at HKA Global, Inc. Id. app. A (DuVal curriculum vitae). In this role, he works with government contractors and focuses on "cost and damages analyses, investigations ([related to] allegations of labor

overcharging), project management, as well as other dispute and compliance related issues."  Id. He is a Certified Fraud Examiner with twenty-three years of consulting experience.  See id. Given this experience, the Court concludes that Mr. DuVal is qualified as a government contracts expert and qualified to opine about damages in this case.

### 3.    Michael Kostiw

DynCorp retained Mr. Kostiw to offer an expert opinion "regarding the relative safety of the Baghdad Hotel and the Al Sadeer Hotel as compared to other hotels, including the Palestine and Sheraton Hotels, in Baghdad, Iraq during 2004 through 2008."  Kostiw Rpt. ¶ 1. Mr. Kostiw is an attorney with Ward & Berry PLLC who "advis[es] clients on compliance and government contracts matters."  Id. Ex. B (Kostiw resume).  For nearly ten years at the beginning of his career, Mr. Kostiw served as an infantry officer in the U.S. Marine Corps.  Id. ¶ 6.  During this time, he was deployed to Baghdad from July 2004 through January 2005.  Id. ¶ 16.  In Iraq, Mr. Kostiw served as the "second-in-command for the coalition/NATO staff responsible for leading the international effort to re-establish the Iraqi Officer Academy . . . at Al Rustamiyah" and assisted in "securing the premises and making them operational."  Id. ¶ 17.  His responsibilities included "security, logistics, and general construction supervision."  Id. ¶ 20. The Court concludes that based on his years of service in the U.S. Marine Corps, his deployment to Iraq during the relevant time period, and his experience with securing a facility in Iraq during this period, Mr. Kostiw is qualified as an expert on the security of lodging in Baghdad during the period relevant to this case.

*B. DynCorp's Motion to Exclude the United States' Expert*

DynCorp moves to exclude the United States' expert Sam Hadley's opinions regarding the costs of lodging at the Baghdad and Al Sadeer Hotels. See DynCorp Mot. at 1. DynCorp challenges Ms. Hadley's two principal conclusions regarding hotel costs. Ms. Hadley concluded that DynCorp had charged the United States unreasonably high rates for lodging at these hotels. See id. at 12. She also concluded that DynCorp had ignored contemporaneous evidence that the rates that its subcontractor Corporate Bank charged were unreasonably high. See id. at 12-13. For the following reasons, the Court will not exclude Ms. Hadley's damages calculations based on the two leases that appeared to run from June 6, 2003 to June 6, 2004, but will exclude Ms. Hadley's damages calculations based on the two leases dated September 1, 2004. The Court will also exclude portions of Ms. Hadley's opinion regarding contemporaneous evidence of unreasonably high rates.

1.   Opinion Regarding Room Rates at the Baghdad and Al Sadeer Hotels

To reach her first conclusion that DynCorp charged the United States unreasonably high rates for lodging at the Baghdad and Al Sadeer Hotels, and to calculate damages, Ms. Hadley examined two leases that appeared to run from June 6, 2003 to June 6, 2004 (the "2003 Purported Leases"). See DynCorp Mot. at 13. One lease listed the owner of the Baghdad Hotel as lessor and a business entity, Al-Katin, as lessee. See id. The other lease listed the owner of the Al Sadeer Hotel as lessor and Al-Katin as lessee. See id. Both leases were signed. Hearing Tr. at 18:14-15; U.S. Opp. at 12; see Lease Packet at ECF 13-19. Ms. Hadley concluded that Corporate Bank was a majority owner of Al-Katin and that the 2003 Purported Leases were agreements between Corporate Bank and the owners of the hotels. See Hadley Rpt. at 3-4.

According to DynCorp, the 2003 Purported Leases came into its possession in July 2005, when they were "delivered in a packet 'without explanation or signature' to a camp across from the U.S. embassy [in Iraq] and then provided to DynCorp."  DynCorp Mot. at 15 n.11.  The cover letter of the packet that contained the 2003 Purported Leases was from an individual named Farhad Sinjari, who purported to be the acting CEO of Al-Katin.  See Lease Packet at ECF 4.  In the letter, Mr. Sinjari appeared disgruntled and alleged that the CEO of Corporate Bank owed Al-Katin money.  See id.  Mr. Sinjari stated that he was providing the 2003 Purported Leases in order to "ask[] DynCorp to not pay [Corporate Bank] and divert all the payments to Al-Katin because the leases of the two hotels are under Al-Katin Company."  Id.

Under the terms of the 2003 Purported Leases, Al-Katin could lease rooms at the Baghdad Hotel for $25 per night and at the Al Sadeer Hotel for $30 per night.  See DynCorp Mot. at 13.  To calculate damages, Ms. Hadley assumed that the 2003 Purported Leases had been extended from year to year through 2007, and that the prices for the rooms at the two hotels rose at rates consistent with Iraqi inflation, as calculated by the International Monetary Fund.  See id. at 15; Hadley Rpt. at 19 sched. A-4.  Based on these assumptions, Ms. Hadley calculated what Al-Katin (and by extension, Corporate Bank) would have paid to the owners of the Baghdad and Al Sadeer Hotels.  See DynCorp Mot. at 15.  She then subtracted that amount from what Corporate Bank actually charged DynCorp – charges that DynCorp eventually passed on to the United States – for rooms at those hotels.  See id. at 15-16.  Ms. Hadley concluded that the difference of $23,950,288 was the amount by which DynCorp overcharged the United States for lodging.  Id.

Ms. Hadley also calculated an alternative damages amount by using what appeared to be another set of leases between the owners of the Baghdad and Al Sadeer Hotels, as

lessors, and Corporate Bank, as lessee (the "2004 Unsigned Purported Leases"). DynCorp Mot. at 16; <u>see</u> 2004 Leases. These leases were dated September 1, 2004, and provided Corporate Bank with options to lease rooms at the Baghdad Hotel for $60 per night and at the Al Sadeer Hotel for $70 per night. <u>See</u> DynCorp Mot. at 16. The 2004 Unsigned Purported Leases were not executed, and no deponent or interviewee spoke to their validity; they were in DynCorp's records, but do not appear to have been part of the packet of materials that was delivered to DynCorp in Iraq in July 2005. <u>See id.</u> Using these leases, Ms. Hadley calculated an alternative damages amount of $18,073,588. <u>Id.</u>

DynCorp challenges Ms. Hadley's damages calculations on five separate grounds. <u>See</u> DynCorp Mot. at 19. The Court discusses each argument in turn.

      a.  <u>Authenticity of 2003 Purported Leases and 2004 Unsigned Purported Leases</u>

First, DynCorp argues that Ms. Hadley's damages calculations are not based on sufficient facts or data because they rest entirely on the 2003 Purported Leases and the 2004 Unsigned Purported Leases, none of which were authenticated. <u>See</u> DynCorp Mot. at 21.

With respect to the 2004 Unsigned Purported Leases, DynCorp argues that there is no evidence that these leases even went into effect or represented any agreement on rates, as the leases are unsigned. DynCorp Mot. at 22. The United States responds that Ms. Hadley performed a damages calculation based on these leases to prepare for the possibility that DynCorp would produce signed copies of them and then use those copies to argue that her other damages calculation was based on the wrong leases. U.S. Opp. at 18 n.7. But DynCorp did not do so, and made no such argument. U.S. Opp. at 18 n.7.[6] The Court therefore will exclude Ms.

---

[6]    At the hearing, the United States came close to conceding that the 2004 Unsigned Purported Leases are not a reliable basis for a damages calculation. <u>See</u> Hearing Tr.

Hadley's damages calculation based on the 2004 Unsigned Purported Leases.[7]  It is unreasonable to rely on unsigned leases that could be drafts or even rejected proposals, particularly when signed leases – like the 2003 Purported Leases – are available.

With respect to the 2003 Purported Leases, DynCorp argues that the signatures on them make little difference.  Ms. Hadley still lacked a reliable basis, according to DynCorp, to conclude that the leases went into effect, that they accurately reflect what Al-Katin (and by extension, Corporate Bank) paid to the owners of the Baghdad and Al Sadeer Hotels, and that they were renewed.  DynCorp Mot. at 21-22.  DynCorp also argues that the 2003 Purported Leases were "generated by an unknown third party, and DynCorp had no knowledge of how they came to be."  DynCorp Reply at 10.

In support of its argument, DynCorp cites Campbell v. National Railroad Passenger Corporation, an employment discrimination case in which the district court precluded testimony from the plaintiffs' expert because the expert "uncritically relied on documents supplied to him by plaintiffs' counsel, cited to those pieces of evidence that supported his theories, and concluded that this selective evidence demonstrate[d] that [the defendant's] practices were inconsistent with generally-accepted human resources management practices." 311 F. Supp. 3d 281, 301 (D.D.C. 2018).  DynCorp argues that Ms. Hadley's conclusions are

---

at 39:2-41:13 (calling it a "fair point[]" that the 2004 Unsigned Purported Leases are unreliable because they could be drafts and bear no indication of an executed contract, id. at 39:16, stating that "the 2003 executed leases are a more appropriate basis for [Ms. Hadley's] analysis," id. at 40:15-16, and stating, "[i]f the 2003 leases are in, we would intend to rely on those with respect to moving forward," id. at 41:12-13).

[7]        Accordingly, the remainder of the Court's analysis considers DynCorp's arguments only with respect to the 2003 Purported Leases, and not with respect to the 2004 Unsigned Purported Leases.

even weaker than those of the expert in <u>Campbell</u> because Ms. Hadley "did not rely on any evidence at all," but instead relied only on documents that lack foundation.  DynCorp Mot. at 23.

In response, the United States argues that the 2003 Purported Leases were "the type of information reasonably relied on by accountants serving as expert witnesses."  U.S. Opp. at 13.  According to the government, unlike the expert in <u>Campbell</u>, Ms. Hadley "scoured DynCorp's files for the type of cost information that should be in a prime contractor's files" and reviewed numerous additional documents.  <u>Id</u>. at 14.  But because of DynCorp's "own substantial failures on the documentation front," she found no better basis on which to calculate damages.  <u>Id</u>. at 12.  The only executed leases that DynCorp produced in discovery were the 2003 Purported Leases, and DynCorp did not produce any other information documenting what Corporate Bank paid for the hotels.  <u>Id</u>.  Therefore, the United States argues, "Ms. Hadley's opinions can only be judged on the materials that were actually available to her, rather than the materials that would have been available had DynCorp met its obligations" under the relevant regulations.  <u>Id</u>. at 16.  "[T]o exclude Ms. Hadley's opinion under such circumstances would only reward DynCorp for its knowing failures on the documentation front."  <u>Id</u>. at 17.  On this point, DynCorp replies that it was not their responsibility to provide Ms. Hadley with an adequate basis for her opinions.  DynCorp Reply at 3.  The government could have constructed such a basis, it argues, by subpoenaing documents from Corporate Bank, deposing Corporate Bank's principal, or subpoenaing documents from Sheraton.  <u>Id</u>.

The Court disagrees with DynCorp.  Ms. Hadley relied on sufficient facts and data in using the 2003 Purported Leases to calculate damages.  While it is possible that these leases will not be admissible in evidence at trial, of course, Ms. Hadley may rely on them as a basis for her opinions, as they are the type of evidence that damages experts would "reasonably

rely on . . . in forming an opinion." FED. R. EVID. 703.  Because these leases are signed, because

DynCorp has no alternative lease records, and because there is no evidence that these leases are

not authentic, it was reasonable for Ms. Hadley to infer that the 2003 Purported Leases were

accurate and to calculate damages based on them.

"Daubert and Rule 702 require only that the expert testimony be derived from

inferences based on a [reliable] method and that those inferences be derived from the facts of the

case at hand, not that the[ expert] know answers to all the questions a case presents – even to the

most fundamental questions."  Jahn v. Equine Servs., PSC, 233 F.3d 382, 390 (6th Cir. 2000)

(citation omitted) (vacating district court's exclusion of expert testimony).  Where "[c]ertainty is

not to be found . . . , due in considerable part to the lack of . . . records kept by the defendant[,]

. . . it seems patently unfair to allow [the defendant] to benefit" from the absence of records.  Id.;

see also Factory Mut. Ins. Co. v. Alon USA L.P., 705 F.3d 518, 525 (5th Cir. 2013) (allowing

hearsay-based expert report appraising property because expert investigations "must be viewed

in light of what was feasible" and the expert "consulted one of the few sources of information

available"); United States ex rel. Johnson v. Golden Gate Nat'l Senior Care, LLC, Civil Action

No. 08-1194, 2020 WL 1942409, at *6 (D. Minn. Apr. 22, 2020) (where the defendant failed to

create complete records for the plaintiff's expert to evaluate, the expert's cost "estimates [were]

just and reasonable based on available relevant evidence").

Campbell does not undermine the government's arguments or the Court's

conclusions.  In Campbell, the expert offered opinions about the defendant's human-resource

practices, but failed to review the depositions of the defendant's human-resource managers, the

documents related to job-selection decisions by the defendant, the documents related to the

defendant's discrimination complaint procedures and anti-discrimination training, and the

relevant collective bargaining agreements.  <u>Campbell v. Nat'l Railroad Passenger Corp.</u>, 311 F. Supp. 3d at 299.  In other words, the expert failed to review many of the relevant documents that <u>were</u> readily available to him.  Here, on the other hand, Ms. Hadley reviewed a wide variety of relevant documents, including transcripts of depositions of DynCorp managers, internal DynCorp emails and records, and the relevant contracts and agreements.  Hadley Rpt. at 31-32. In sum, unlike the expert in <u>Campbell</u>, she reviewed all the relevant information to which she had access.

Perhaps DynCorp is right that the government could have done more to gather additional materials on which Ms. Hadley could base her opinion.  But DynCorp is wrong that its own documentation failures are irrelevant to the admissibility of Ms. Hadley's damages calculation.  The Court's role is to ensure that an expert employs "<u>reasonable</u> measures of reliability,"  <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. at 152-53 (emphasis added), and expert witnesses may present opinions based on inadmissible evidence "if experts in the particular field would <u>reasonably</u> rely on those kinds of" evidence.  FED. R. EVID. 703 (emphasis added). DynCorp's lack of documentation as to the lease agreements is relevant to the question of whether it was reasonable for Ms. Hadley to rely on lease documents with an uncertain paper trail.  Subpoenaing documents or deposing additional corporate officials may have helped solidify this paper trail, but it also may not have.  Given the fact that discovery turned up no other executed leases and no invoices showing what Corporate Bank actually paid for the hotels, it was reasonable for Ms. Hadley to rely on the executed leases that DynCorp produced in discovery.  DynCorp is free to incorporate, in its arguments about the weight the jury should grant Ms. Hadley's damages calculation, its point that the government could have done more investigation.

b.  Additional Cost Components

Second, DynCorp argues that Ms. Hadley failed to consider the fact that the rates that Corporate Bank charged DynCorp – and that DynCorp eventually charged the United States – incorporated "additional cost components" not set forth in the 2003 Purported Leases. DynCorp Mot. at 19.  DynCorp points out that the 2003 Purported Leases did not explicitly mention maintenance, housekeeping, trash disposal, or groundskeeping costs, all of which Corporate Bank had agreed to provide to DynCorp.  Id. at 23.  Instead, the 2003 Purported Leases included line items for general additional services.  Id. at 23-24.[8]  DynCorp also notes that the 2003 Purported Leases do not provide that the lessee would have exclusive use of the hotels, even though that was the arrangement through which DynCorp ultimately occupied them. Id. at 24.  The United States counters that these differences are partly due to DynCorp's "failures on the documentation front" and that there is "no other information in DynCorp's files documenting what Corporate Bank actual[ly] paid for the hotels."  U.S. Opp. at 12.

There is some logic to DynCorp's argument.  If Ms. Hadley knew that Corporate Bank paid more than the amounts listed in the leases, then it would have been unreasonable to calculate damages based only on those amounts.  But Ms. Hadley could not know how much, if anything, Corporate Bank paid above the lease amounts because of DynCorp's lack of documentation.  As discussed above, the United States received no invoices from DynCorp showing what Corporate Bank paid to the hotels. Therefore, Ms. Hadley's decision to exclude potential additional costs from her damages calculation was reasonable.  The services promised

---

[8]    The Baghdad Hotel lease stated that the hotel would "prepare the bar located on the first floor for Al-Katin Company's clients to use as a relaxation and drinking area" and that "[t]he client shall pay in cash for this service including other Hotel services."  Lease Packet at ECF 6.  The Al-Sadeer Hotel lease stated that Al-Katin "will be given a discount on food, drinks and other services and within the jurisdiction of the authorized manager."  Id. at ECF 9.

to DynCorp and the services described in the 2003 Purported Leases may be bases for cross-examination, but are not bases to exclude Ms. Hadley's opinions.

### c. Comparisons to Other Hotels in Baghdad

Third, DynCorp argues that Ms. Hadley's methodology is unreliable because she failed to consider the prices of other, comparable hotels in Baghdad in reaching her conclusions. DynCorp Mot. at 24. DynCorp argues that Ms. Hadley should have compared the rates that Corporate Bank charged DynCorp with "prices for comparable goods or services – in this case, for the prices of lodging in Baghdad during the period 2004 through 2007" that was similarly secure to the lodging at the Baghdad and Al Sadeer Hotels. Id.

The Court declines to exclude Ms. Hadley's opinions on this basis. At best, DynCorp points out an alternative reliable methodology that Ms. Hadley could have used. But as the United States argues, "merely using a different methodology does not warrant an expert's exclusion." U.S. Opp. at 20. Instead, it is the task of the Court to determine whether it was reasonable for an expert to choose the methodology that they did use. See Kumho Tire Co. v. Carmichael, 526 U.S. at 153-54. Here, instead of comparing the rates that Corporate Bank charged DynCorp with the rates that other hotels charged during the same time period, Ms. Hadley compared the rates that Corporate Bank charged DynCorp with the best evidence she could find of the rates that the hotels themselves charged Corporate Bank. In other words, instead of attempting to calculate the difference between what DynCorp charged the government and what DynCorp would have paid for comparable services, Ms. Hadley attempted to calculate the difference between what DynCorp charged the government and what DynCorp's subcontractor actually paid for the services in question. And additional materials that Ms.

19

Hadley reviewed suggested that, if anything, a market analysis would have supported her conclusions.  See U.S. Opp. at 20-21.

Because Ms. Hadley's goal was to determine whether, and by how much, DynCorp overcharged the government, the Court finds her methodological choice to be a reasonable one.  DynCorp is free to make an argument to the jury that Ms. Hadley should have considered the prices of other, comparable hotels in Baghdad in calculating damages.

### d.  Reference to Joint Travel Regulations

Fourth, DynCorp contends that Ms. Hadley's methodology is unreliable because she failed to consider government regulations – the Joint Travel Regulations ("JTR") – that pertained to rates of reimbursement for overseas lodging.  DynCorp Mot. at 25.  The JTR "implements policy and law to establish travel and transportation allowances for Uniformed Service members . . . , Department of Defense (DoD) civilian employees, and others traveling at the DoD's expense."  Def. Travel Mgmt. Off., U.S. Dep't of Def., Joint Travel Regulations, www.travel.dod.mil/Policy-Regulations/Joint-Travel-Regulations.  The parties agree that the JTR includes per diem travel rates meant to cover the cost of lodging.  See DynCorp Mot. at 16; U.S. Opp. at 22.  But the parties disagree about the relevance of these rates.

According to DynCorp, it was unreasonable for Ms. Hadley not to take into account the JTR rates for lodging in Baghdad during the relevant time period – rates which were three to four times higher than the room rates in the leases.  DynCorp Mot. at 26.  DynCorp points to language in the CivPol Contract stating that travel and housing expenses incurred by DynCorp "shall be in accordance with . . . [the] Joint Travel Regulations."  Id. (quoting CivPol Contract at 8).  DynCorp also points to the fact that the government considered the JTR rates when auditing CivPol Contract performance.  See id.

The Court will not exclude Ms. Hadley's opinions based on the assertion that she failed to use the JTR rates. As the United States points out, Ms. Hadley did consider the JTR rates in her analysis, but concluded that they did not apply. See U.S. Opp. at 22-23. Ms. Hadley noted in her report that the JTR rates "don't appear to represent reasonable compensation for what was being purchased under the CIVPOL contract" because they "are ceiling daily rates for single travelers seeking lodging on a short-term basis," which "would be higher than rates paid for an entire block of hotel rooms for a contracted period of time." Hadley Rpt. at 5-6 n.20. The Court finds this to be a perfectly reasonable opinion, but one which DynCorp is free to challenge at trial. Indeed, it has retained a rebuttal expert to do just that.

e. Reimbursable Costs

Finally, DynCorp argues that Ms. Hadley lacks a basis to opine that Corporate Bank overcharged DynCorp because she did not know what Corporate Bank's actual costs for the hotels were. DynCorp Mot. at 28. Both DynCorp and the United States note that there are two principal types of government contracts: cost-reimbursable contracts and firm-fixed-price contracts. Id. at 28 n.14; U.S. Opp. at 3 n.1. Under a cost-reimbursable contract, a contractor is reimbursed for its reasonable costs, plus an agreed profit. DynCorp Mot. at 28 n.14. Under a fixed price contract, a contractor is paid a fixed amount, regardless of the contractor's actual costs. Id. According to DynCorp, Ms. Hadley assumed that the subcontract between DynCorp and Corporate Bank was a cost-reimbursable contract when there was more evidence that it was a fixed price contract, namely invoices and purchase orders that had "FIRM FIXED PRICE" written on them. Id. at 29-30.

The United States responds that the weight of the evidence supports Ms. Hadley's conclusion that the contract was cost-reimbursable, not firm fixed price. U.S. Opp. at 7. The

government points to three affirmative facts:  first, the task orders through which DynCorp subcontracted with Corporate Bank contained the words "cost plus fixed fee," which is a type of cost-reimbursable contract; second, the task orders and subsequent modifications included estimated costs; and third, the task orders incorporated a provision of the FAR applicable only to cost-reimbursable contracts.  Id. at 8 (citing FAR 16.306(a), 52.232-20; Task Order #002; Task Order #003; Baghdad Mods.; Al-Sadeer Mods.).  The government also refutes DynCorp's evidence that the contract was firm fixed price by pointing to an email from a DynCorp contract administrator stating that the "Firm Fixed Price" notation on a different purchase order was erroneous and that the order was actually cost-reimbursable.  See id. at 7-8; Contract Admin. Email.

   The Court finds these facts to be more than sufficient for Ms. Hadley to conclude that the contract was cost-reimbursable and to calculate damages accordingly.  Any evidence to the contrary is more appropriately deployed in cross-examination or through DynCorp's rebuttal expert.[9]

   2. Opinion Regarding Contemporaneous Evidence of Unreasonably High Rates

   With respect to her opinion that DynCorp "ignored available documentation indicating that its subcontractor costs were unreasonable," Hadley Rpt. at 6, Ms. Hadley relied on two groups of documents.  The first group included RFPs, subcontract modifications, and related communications.  See id. at 6.  These documents showed that, "although the quoted rates

---

[9]   DynCorp also argues that Ms. Hadley's methods are unreliable because, even assuming that the subcontract was cost-reimbursable, she does not know for sure what Corporate Bank paid for the hotels.  DynCorp Mot. at 28.  But this is simply DynCorp's argument about leases in a different form.  Again, the Court finds that Ms. Hadley's methodology was reasonable because she used the best evidence of Corporate Bank's costs that was available to her.

for the Sheraton and Palestine hotels were lower than the room rates at the Baghdad and Al-Sadeer Hotels, DynCorp still chose to accept the higher rates and pass the cost on to DOS."  Id. The second group consisted of five emails in which DynCorp employees "express[ed] their view that the hotel rates that DynCorp w[as] paying were too high" and one draft presentation in which DynCorp "express[ed] concern with the cost of lodging" at the Baghdad and Al Sadeer Hotels.  DynCorp Mot. at 17; see Hadley Rpt. at 6-7.  DynCorp argues that Ms. Hadley's reliance on this second group of documents is improper because the emails and presentation are hearsay and Ms. Hadley does not apply her expertise to them.  DynCorp Mot. at 30-31. DynCorp also maintains that a layperson would be equally able to evaluate this evidence.  Id. at 31.  The United States responds that "government contracts are complex" and that, given Ms. Hadley's experience with auditing government contracts, "she knows the type of information that should raise red flags for procurement professionals about the reasonableness of subcontractor costs."  U.S. Opp. at 24.  The government also argues that the evidence that Ms. Hadley analyzed is not hearsay because it is an admission of a party opponent.  Id. at 24-25.

The Court agrees with DynCorp that Ms. Hadley's reliance on the second group of documents is improper.  The jury is "just as competent" as Ms. Hadley to read the emails and presentation and can determine for itself whether they should have put DynCorp on notice that the hotel rates were unreasonably high.  See Gilmore v. Palestinian Interim Self-Government Auth., 843 F.3d at 973 (quoting Henkel v. Varner, 138 F.2d at 935).  Government contracts may be complex, but the communications at issue are not.  In them, DynCorp employees call the hotel rates "expensive," "more than a fair price," and "outrageous"; they also describe the rates for the Palestine and Sheraton Hotels "just down the street."  Hadley Rpt. at 6-7.  The jury does not need any particular expertise to adequately consider whether these communications – expressing the

personal views of certain DynCorp employees – should have put DynCorp on notice. Because the emails and presentation are the primary basis for Ms. Hadley's opinion that DynCorp "ignored" evidence indicating that the hotel rates were "unreasonable," see Hadley Rpt. at 6, the Court will exclude this opinion as well. See United States ex rel. Morsell v. Symantec Corp., Civil Action No. 12-0800, 2020 WL 1508904, at *14 (D.D.C. Mar. 30, 2020) (excluding expert testimony that "depend[s] on general familiarity with email communications much more than it does on any industry-specific expertise").

At this point, however, the Court need not reach a conclusion about whether the communications are admissible at trial. As DynCorp points out, the government would need to show additional facts to support admission of the communications as statements of a party opponent exempt from the rules of hearsay. DynCorp Reply at 21-22; see FED. R. EVID. 801(d)(2). But as the government notes, the communications may be admissible for reasons other than their truth – for example, to show DynCorp's knowledge. U.S. Opp. at 25; see FED. R. EVID. 801(c). Either way, Ms. Hadley cannot discuss them because she is not any better equipped to evaluate them than the jury would be.

To be clear, Ms. Hadley may still state her conclusions about DynCorp's knowledge based on her expertise and on the first group of documents. A jury could not easily make sense of the RFPs, subcontract modifications, and related communications from which she concludes that DynCorp had evidence that the rates at the hotels they ultimately chose were higher than the rates of other options. See Hadley Rpt. at 6. In addition, Ms. Hadley may draw reasonable inferences from these documents and opine, for example, that DynCorp had "early indications C[orporate ]B[ank] was inflating the lodging rates." Id.

*C.  United States' Motion to Exclude DynCorp's Experts*

The United States moves to exclude some of DynCorp expert Jeffrey DuVal's opinions on damages and all of DynCorp expert Michael Kostiw's opinions on the security of hotels in Baghdad.  For the following reasons, the Court will exclude portions of Mr. DuVal's opinions relating to the CivPol Contract and government audits, but will admit Mr. Kostiw's opinions in full.

1.  Jeffrey DuVal

The United States moves to exclude certain opinions offered by DynCorp expert Jeffrey DuVal to rebut Ms. Hadley's opinions on damages.  See U.S. Mot. at 12.  Mr. DuVal opines that Ms. Hadley's damages calculations are "flawed and speculative" and that the maximum amount of potential damages is the amount DynCorp paid in excess of the JTR rates. DuVal Rpt. ¶ 38; see DynCorp Opp. at 14.  He cites three primary bases for his opinion:  first, the language of the CivPol Contract itself, DuVal Rpt. ¶¶ 24-25; second, a government agency's use of the JTR rates while auditing the CivPol Contract, id. ¶¶ 26-27; and third, the decision by DoS to pay in full the amounts DynCorp billed for lodging.  Id. ¶¶ 30-32.

The United States maintains that Mr. DuVal's opinions regarding the terms of the CivPol Contract should be excluded because expert witnesses cannot testify to questions of law. U.S. Mot. at 12-13.  In his expert report, Mr. DuVal notes that "[t]he CivPol contract states that DynCorp's travel and housing expenses shall be incurred subject to the Joint Travel Regulations" and opines that Ms. Hadley "gives no basis to explain why the JTR rates would not apply given that the CivPol Base Contract expressly incorporates the JTR."  DuVal Rpt. at 10.  The United States argues that Mr. DuVal is interpreting the CivPol Contract, and that such contract interpretation is a legal conclusion and therefore improper expert testimony.  U.S. Mot. at 12.  In

response, DynCorp argues that Mr. DuVal did not interpret the CivPol Contract in his report but "merely noted that the JTR is specifically referenced in the contract" and made reasonable inferences from that fact based on his expertise.  DynCorp Opp. at 15.

   "In the absence of specialized trade usage, expert testimony regarding proper contract interpretation is inadmissible, as is expert testimony regarding the legal significance of the contract language."  Sparton Corp. v. United States, 77 Fed. Cl. 1, 8 (2007); see also TCP Indus., Inc. v. Uniroyal, Inc., 661 F.2d 542, 549 (6th Cir. 1981) (similar); United States ex rel. Morsell v. NortonLifeLock, Inc., 567 F. Supp. 3d 248, 263 (D.D.C. 2021) (excluding expert opinions based on contract interpretation).  The provision at issue here involves no specialized trade usage.  It states:

> "Travel/Housing expenses incurred by the contractor shall be in accordance with the Standard Government Travel Regulations, Joint Travel Regulations, or the Federal Travel Regulation's [sic] in effect at the time of each trip . . . ."

CivPol Contract at 8.  The mentions of regulations do not constitute specialized trade usage, as they are simply references to external documents.  Neither does the phrase "in accordance with"; Mr. DuVal does not assert or provide any evidence that the phrase takes on a meaning other its common one.  Therefore, expert opinion interpreting the meaning of this contract provision is improper.  And it is a question of interpretation whether this provision in the CivPol Contract means that housing expenses must accord with the JTR's particular requirements, with its listed rates, or with both the requirements and the rates – or whether the contract provision means something else entirely.  This question of contract interpretation is one for the Court to resolve or for a properly instructed jury to decide.

   At the same time, it is not an interpretation of the CivPol Contract for Mr. DuVal merely to say that the contract mentions the JTR, or to restate or paraphrase relevant contract

language to put his opinions in context.  The CivPol Contract states that housing expenses "shall be in accordance with the . . . Joint Travel Regulations."  CivPol Contract at 8.   It is thus proper for Mr. DuVal to repeat or paraphrase the "in accordance with" language, for example by stating that "[t]he CivPol contract states that DynCorp's travel and housing expenses shall be incurred subject to the Joint Travel Regulations."  See DuVal Rpt. ¶ 24.  It is also permissible for Mr. DuVal to draw reasonable inferences from the fact that the contract mentions the JTR.  However, the Court will exclude Mr. DuVal's conclusions if they are based on his understanding of what the CivPol Contract's JTR language means.  Specifically, the Court will exclude Mr. DuVal's opinion that "the CivPol Base Contract expressly incorporates the JTR."  See DuVal Rpt. ¶ 25. An opinion that the relevant travel expenses must accord with all of the JTR, or with specific parts of it, or that the contract "incorporates the JTR," crosses the line into improper contract interpretation.  When discussing the relationship between the CivPol Contract and the JTR, Mr. DuVal may not say what he thinks the contract language means or draw inferences based on his understanding of what the contract language means.

        The United States also argues that Mr. DuVal's two opinions regarding what rates government agencies believed to be reasonable are "baseless, unreliable, speculative, and unduly prejudicial."  U.S. Mot. at 14, 15.  First, Mr. DuVal opines that the Defense Contract Audit Agency ("DCAA") – which provides audit and financial advisory services to federal entities, DuVal Rpt. ¶ 26 – determined that the JTR rates were presumptively reasonable because each time the DCAA audited the CivPol Contract, it "compared Corporate Bank's hotel room rates to the JTR rate, and questioned those portions of the rates that exceeded the JTR rate."  Id. ¶ 27; see U.S. Mot. at 15.  Second, according to Mr. DuVal, DoS regarded as reasonable the amount that DynCorp billed for the Baghdad and Al Sadeer Hotels because DoS paid DynCorp these

amounts in full.  See U.S. Mot. at 14.  In his report, Mr. Duval states that the DoS contracting

officer "presumably reviewed the DCAA Auditor Report" and that "[t]he fair inference is that

the Department of State recognized that DynCorp's hotel rates were reasonable, given the

circumstances under which they were being charged."  DuVal Rpt. ¶ 30.

       The United States argues that both of these opinions are speculative because Mr.

DuVal did not have any knowledge of the state of mind of the DCAA auditor or of the DoS

officer.  U.S. Mot. at 14-15.  DynCorp responds that Mr. DuVal is not speculating because he

was aware of the full circumstances of the DCAA audit, and of the DoS contract review, in

rendering these opinions.  DynCorp Opp. at 17.  According to DynCorp, Mr. DuVal should be

allowed to explain, "based on his years as an expert in government contracting, the significance

of the DCAA's references to and reliance upon the JTR."  DynCorp Opp. at 18.

       The Court agrees with the United States.  "[T]he rules of evidence preclude"

"experts' reports consist[ing] of 'subjective belief or unsupported speculation.'"  Heller v. D.C.,

801 F.3d 264, 272 (D.C. Cir. 2015) (quoting Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549,

567 (D.C. Cir. 1993)).  As courts in other districts have held, "[e]xpert witnesses are not

permitted to testify as to the 'knowledge, motivations, intent, state of mind, or purposes' of

others."  See Fleischman v. Albany Med. Ctr., 728 F. Supp. 2d 130, 168 (N.D.N.Y. 2010)

(quoting In re Fosamax Products Liability Litigation, 645 F. Supp. 2d 164, 192 (S.D.N.Y.2009)).

"Similarly, an expert may not speculate about what other individuals knew or would have done

with certain information."  Kelley as Tr. of BMO Litig. Tr. v. BMO Harris Bank N.A., Civil

Action No. 19-1756, 2022 WL 4547022, at *6 (D. Minn. Sept. 29, 2022); see, e.g., United States

v. Second Chance Body Armor, Inc., 289 F. Supp. 3d 145, 157-58 (D.D.C. 2018) (excluding

expert testimony about defendant's "intent or motivations" as "based on unsupported speculation").

Mr. DuVal has no knowledge of what the DCAA auditor or DoS officer had in their mind when they conducted the audit or paid the bills for the CivPol Contract. Therefore, it is too speculative to say that the DoS officer believed the hotel rates to be reasonable, or that the DCAA auditor believed the JTR rates to be reasonable. The Court will exclude these opinions. Of course, as a government contracts expert, Mr. DuVal is permitted to explain the DCAA audit process or the DoS contract review process, to the extent they are relevant. What he may not do is speculate as to what the DCAA auditor or DoS officer believed. See Kelley as Tr. of BMO Litig. Tr. v. BMO Harris Bank N.A., 2022 WL 4547022, at *6 ("An expert may, however, testify about observable underlying facts that could be relevant to determining the mental state of an individual or entity.").

Mr. DuVal's reliance on the DCAA auditor's and DoS officer's conclusions is improper for another reason. An expert's methodology is generally unreliable when it consists of little more than parroting someone else's opinions. This is because deferring to others is rarely a "reliable principle[ or] method[]." See FED. R. EVID. 702(c). "[T]he expert witness must in the end be giving his own opinion." Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007); see Am. Key Corp. v. Cole Nat. Corp., 762 F.2d 1569, 1580 (11th Cir. 1985) ("Expert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not."); Dura Auto. Sys. of Indiana, Inc. v. CTS Corp., 285 F.3d 609, 613 (7th Cir. 2002) (Where an expert witness relies on a different expert's judgment, and "the soundness of the underlying expert judgment is in issue," the expert witness cannot testify

"for the purpose of vouching for the truth of [the underlying expert judgment]." (quoting Matter of James Wilson Assocs., 965 F.2d 160, 173 (7th Cir. 1992))).

Mr. DuVal's conclusion that the JTR rates represent reasonable charges for the Baghdad and Al Sadeer Hotels is based, in large part, on what he believes the DCAA auditor's opinion to be. Instead of independently evaluating whether the JTR rates were reasonable prices for the hotels, he assumes that they were reasonable because – in his view – the DCAA auditor thought so. In other words, instead of forming his own opinion about the JTR rates, he deferred to the DCAA auditor's view of them. This is not a reliable methodology for performing a damages calculation. If Mr. DuVal wishes to calculate damages based on the JTR rates, he must articulate his own opinion about why those rates are reasonable.

In addition, the United States argues that the probative value of Mr. DuVal's opinions is substantially outweighed by the danger of unfair prejudice under Rule 403 of the Federal Rules of Evidence. U.S. Mot. at 14, 15. While some of Mr. DuVal's opinions will be excluded for the reasons already described, the Court is unpersuaded by this catchall assertion. The government fails to explain what it believes the unfair prejudice to be, and the Court does not see any.[10]

---

[10]    To the extent that the United States contends that Mr. DuVal's opinions are not helpful to the jury because the jury is competent to assess the underlying DCAA audit reports on its own, see U.S. Reply at 12-13, the Court rejects this argument. The audit reports are complicated documents, and Mr. DuVal, with his extensive experience in government contracting, and in DCAA audits in particular, can help the jury understand them.

The United States also argues that Mr. DuVal should be precluded from referencing Mr. Kostiw's opinions regarding the security of the hotels in Baghdad. U.S. Mot. at 15. But because the Court will not exclude any of Mr. Kostiw's opinions, see infra Section III.C.2, Mr. DuVal is not precluded from referencing them.

2.    Michael Kostiw

The United States moves to exclude all of DynCorp expert Michael Kostiw's opinions about the safety of the Baghdad and Al Sadeer Hotels compared to the Palestine and Sheraton Hotels.  U.S. Mot. at 6.  The Court will admit Mr. Kostiw's opinions in full.  The Court discusses the United States' challenges to Mr. Kostiw's methodology and opinions in turn.

a.    Mr. Kostiw's Methodology

The United States argues that Mr. Kostiw's methodology for analyzing the comparative security of the hotels is unreliable, speculative, and not helpful to the jury.  See U.S. Mot. at 6.  The government makes two assertions as to why it believes Mr. Kostiw's methodology is flawed.

First, the United States argues that Mr. Kostiw's conclusions are not based on sufficient facts or data.  It contends that the documents Mr. Kostiw relies on to reach his conclusions – ten documents produced by the parties in this case, a transcript from the deposition of a former DynCorp executive, and interviews with two low-level former DynCorp employees – are insufficient.  U.S. Mot. at 6.  The government also argues that it is improper for Mr. Kostiw to rely on a site survey of the Palestine and Sheraton Hotels (the "Site Survey"), see Kostiw Dep. at ECF 17-27, without having access to a similar survey of the Baghdad and Al-Sadeer Hotels.  U.S. Mot. at 7.  DynCorp counters that Mr. Kostiw cited sources in addition to the ones described by the government, like a Marine Corps publication and a think tank article, and that his conclusions are appropriately also based on his experiences in Baghdad.  DynCorp Opp. at 11-12.

The Court agrees with DynCorp.  "[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."  Kumho

Tire Co. v. Carmichael, 526 U.S. at 156; see, e.g., Bazarian Int'l Fin. Assocs., LLC v.

Desarrollos Aerohotelco, C.A., 315 F. Supp. 3d 101, 112 (D.D.C. 2018) ("[The expert's] reliance

on his extensive experience in the industry is sufficient to support the opinions proffered in his

Report.").  The sources that Mr. Kostiw consulted, in addition to his own experience as an

infantry officer in Baghdad and leader of the effort to re-establish the Iraqi Officer Academy, are

appropriate bases for his expert testimony.  While access to a similar survey of the Baghdad and

Al Sadeer Hotels may have improved Mr. Kostiw's analysis, that fact does not render improper

his consideration of the Site Survey, the reliability of which the government does not dispute.

The Court declines to exclude Mr. Kostiw's expert testimony as lacking sufficient facts or data.

   Second, the United States argues that Mr. Kostiw improperly compares "apples to

oranges" by comparing the security of the Baghdad and Al Sadeer Hotels after DynCorp had

already made improvements to them with the security of the Palestine and Sheraton Hotels

before any potential improvements.  U.S. Mot. at 6.  Mr. Kostiw formed his conclusion that the

Baghdad and Al Sadeer Hotels were the safer alternatives, in part, based on those hotels'

"superior perimeter defense capabilities [and] observation and detection capabilities."  Kostiw

Rpt. ¶ 27.  These capabilities included CCTV, security barriers, spotlights, machine gun posts,

observation towers, entry control points, dog handler teams, and security guard forces – many of

which DynCorp added or improved before occupying the hotels.  Id. ¶¶ 54, 56, 64.  The United

States asserts that Mr. Kostiw did not seriously consider whether DynCorp could have made

these same enhancements at the Palestine and Sheraton Hotels.  See U.S. Mot. at 7-9.  Rather,

according to the government, Mr. Kostiw merely speculated that it would have been difficult to make these improvements.  Id.[11]

       The Court concludes that Mr. Kostiw's methodology is not flawed or unreliable and that Mr. Kostiw adequately considered the possibility of making improvements to the Palestine and Sheraton Hotels.  As DynCorp argues, the Site Survey – which, as the government notes, is "the primary document Kostiw relies on," U.S. Mot. at 6 –  describes various enhancements that DynCorp would have needed to make had it decided to occupy those facilities.  See DynCorp Opp. at 9-10; Kostiw Dep. at ECF 24.  In addition, Mr. Kostiw explicitly discusses possible improvements in his report.  For example, regarding the Palestine and Sheraton Hotels' lack of adequate observation facilities, Mr. Kostiw wrote that adding additional towers would have been difficult because "[t]he materials and the expertise necessary to construct the towers were likely not readily available and the security measures necessary to erect the towers would likely have been extensive."  Kostiw Rpt. ¶ 64, at 21.  And regarding the need for more expatriate security supervisors at the Palestine and Sheraton Hotels, Mr. Kostiw

---

[11]     The United States makes other arguments about why Mr. Kostiw's comparisons are inapt:  Mr. Kostiw did not know whether the Baghdad Hotel had more than one entry control point or a badging system before DynCorp leased the facility, did not know for sure that the Al Sadeer Hotel had more than one entry control point or a badging system even after DynCorp began occupying the facility, and did not know for sure that DynCorp could not have leased the Palestine and Sheraton Hotels in full (thereby displacing the international media).  U.S. Mot. at 9-11.  But, as with DynCorp's arguments for excluding Ms. Hadley's testimony, these points are better made as challenges to Mr. Kostiw's conclusions during cross examination.  Mr. Kostiw's methodology is reasonably reliable even though he did not know, with certainty, every fact about the relevant facilities.  See Jahn v. Equine Servs., PSC, 233 F.3d at 390.

       The United States further argues that it is improper speculation for Mr. Kostiw to assert that hotels housing international media would have been "key targets" for insurgent attacks.  U.S. Reply at 8.  But, as with Mr. Kostiw's analyses of the difficulty of making security improvements and of the Baghdad and Al Sadeer Hotels' locations, see infra, Mr. Kostiw's experience provides a sufficient basis from which to draw these conclusions.

wrote that "it was difficult to assess the[] proficiency" of new security contractors and that "[t]he challenge of finding a firm to provide" as much additional security as necessary "would likely have been complicated, time-consuming, and introduced substantial risk." Id. ¶ 64, at 23-24. These opinions are not mere speculation. They are legitimate opinions based in large part on Mr. Kostiw's "extensive and specialized experience" attempting secure an establishment in Baghdad. See Kumho Tire Co. v. Carmichael, 526 U.S. at 156.

        Furthermore, Mr. Kostiw's opinions about the security of the hotels are based on more than the hotels' relative perimeter defense and detection capabilities. Mr. Kostiw also considered the locations of the hotels – a factor which, as DynCorp notes, could not have been changed. See DynCorp Opp. at 10. According to Mr. Kostiw, the Palestine and Sheraton Hotels were "directly situated on high-speed avenues of approach" susceptible to insurgent attacks, while the Baghdad and Al-Sadeer Hotels were not. Kostiw Rpt. ¶¶ 27, 66-68. The Baghdad Hotel "had a significant setback from potential avenues of approach," and "[w]hile the Al Sadeer was situated on one potential avenue of approach, [that avenue of approach] was parallel to the hotel and thus would not permit insurgents to directly approach the hotel at high-speed." Id. ¶ 52. The United States maintains that DynCorp could have taken measures to mitigate the location-based flaws of the Palestine and Sheraton Hotels. U.S. Reply at 4-5. It says that the roads next to the hotels could have been closed to traffic, just as DynCorp closed roads next to the Baghdad and Al Sadeer Hotels, and that additional fortifications could have been added to the Palestine and Sheraton Hotels. Id. at 6. These assertions may be appropriate for cross examination in an attempt to show that the conclusions Mr. Kostiw drew from the hotels' locations are wrong. They do not, however, show that his analysis was methodologically flawed.

b.  <u>Mr. Kostiw's Opinions</u>

The United States also argues that Mr. Kostiw's opinions should be excluded pursuant to Rules 702 and 403 of the Federal Rules of Evidence because they would not be helpful to the jury and are unduly prejudicial.  U.S. Mot. at 10-11.  According to the government, there is nothing about Mr. Kostiw's opinions that would help the jury understand the underlying documents that Mr. Kostiw examined as part of his expert report.  <u>Id</u>. at 11.  The United States contends that DynCorp can seek to admit these documents at trial and call fact witnesses to provide firsthand testimony about security in Baghdad.  U.S. Reply at 9.

The Court disagrees.  While it is possible that the jury might be able to evaluate documents like the Site Survey and come to some reasonable conclusions about the security of the relevant hotels, a lay juror would not be able to evaluate certain features relevant to the hotels' security.  For example, they could look to the Site Survey to evaluate the adequacy of the barriers that existed around the perimeter of the Palestine and Sheraton Hotels, <u>see</u> Kostiw Dep. at ECF 19-20, but it would be difficult for a lay juror, simply by looking at maps and images of the compounds, <u>see</u> <u>id</u>. at ECF 25-27, to decide which hotels were more "exposed to high-speed avenues of approach" from potential threats.  <u>See</u> Kostiw Rpt. ¶ 67.  And even the conclusions that a jury could make on their own would be augmented by Mr. Kostiw's expertise and experience.  For example, a lay juror would not know the full range of consequences of having only one access point for vehicles.  <u>See</u> <u>id</u>. ¶ 64, at 18-19.  In sum, the Court concludes that the jury would benefit from Mr. Kostiw's testimony explaining why he believes certain hotels in Baghdad were safer than others during the relevant time period.  The Court therefore declines to exclude Mr. Kostiw's opinions under Rule 702.

In addition, the government argues that, under Rule 403, the probative value of Mr. Kostiw's testimony is substantially outweighed by the risk of unfair prejudice. U.S. Mot. at 11; see FED. R. EVID. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ."). The United States contends that Mr. Kostiw's testimony has limited probative value because the dangers that CivPol workers faced in Iraq did not excuse DynCorp from charging the United States reasonable lodging rates. U.S. Mot. at 11-12. According to the government, Mr. Kostiw's testimony is prejudicial and likely to distract the jury because Mr. Kostiw is a former combat veteran and military officer who will be talking about the dangerousness of operating in a war zone. Id. at 11. DynCorp responds that Mr. Kostiw's opinions are probative because security considerations in Baghdad were crucial to DynCorp's choice of hotels. DynCorp Opp. at 12.

The Court agrees with DynCorp. The primary subject of Mr. Kostiw's testimony is not the dangers CivPol workers faced in Baghdad in the abstract, but rather the relative security of the hotels DynCorp leased. And the security of these hotels, compared to other options, is relevant to the question of whether the lodging rates charged to DynCorp were reasonable. If, as Mr. Kostiw concludes, the Baghdad and Al Sadeer Hotels were significantly more secure than DynCorp's other options, then it may have been reasonable for DynCorp to pay significantly more to lease those hotels. Any risk of the jury being prejudiced or distracted by Mr. Kostiw's testimony or background does not substantially outweigh the probative value of his opinions. The Court therefore declines to exclude Mr. Kostiw's opinions under Rule 403.

## IV. CONCLUSION

For all of these reasons, the Court will grant in part and deny in part the United States' Motion to Exclude Testimony of Defendant DynCorp International LLC's Experts Michael W. Kostiw and Jeffrey S. DuVal [Dkt. No. 140]. The Court will exclude portions of proffered DynCorp expert Jeffrey DuVal's opinions and testimony, but will not exclude any of proffered DynCorp expert Michael Kostiw's opinions and testimony, as set forth in this Opinion.

The Court will also grant in part and deny in part DynCorp's Motion to Exclude the Opinions and Testimony of the Government's Proffered Expert on Hotel Costs [Dkt. No. 123]. The Court will exclude portions of proffered United States expert Sam Hadley's opinions and testimony, as set forth in this Opinion.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 1/25/24

37